478 So.2d 172 (1985)
Helen Marie BAILEY, in Her Capacity as Tutrix of the Minors, Terrance Bailey and Derek Bailey, Plaintiff-Appellant,
v.
Bernard DOUGLAS, Defendant-Appellee.
No. 84-656.
Court of Appeal of Louisiana, Third Circuit.
October 28, 1985.
Writ Denied December 13, 1985.
*173 Edward Larvadain, Alexandria, for plaintiff-appellant.
Helen Bailey In Pro. Per. for plaintiff-appellant.
Steven C. Graalman, Alexandria, for defendant-appellee.
Before DOMENGEAUX, FORET, STOKER, DOUCET and YELVERTON, JJ.
FORET, Judge.
This is an action to prove paternity and obtain child support. Plaintiff, Helen Marie Bailey, filed suit on behalf of her minor sons, Terrance Bailey and Derek Bailey, alleging that defendant was the father of the two minors and requesting that the court order defendant to pay child support. Following a trial on the merits, the court held for defendant, finding that plaintiff had failed to carry her burden of proof. Plaintiff appealed.

FACTS
Plaintiff, Helen Marie Bailey, and defendant, Bernard Douglas, first met during the summer of 1966. Plaintiff and defendant had sexual relations at least once in September of 1966, during the Labor Day weekend. That much was admitted by defendant. Defendant, however, maintains that that was the only time and that he stopped seeing plaintiff not long afterwards. Plaintiff maintains that her relationship with defendant did not end in September of 1966, but lasted for several years, and that her two sons, Terrance Bailey and Derek Bailey, were born from this relationship. She testified that her intimate relationship with defendant lasted for nearly three years. According to her, she and defendant seldom went out in public but, for the most part, went to defendant's home. She also testified that she and defendant often got together with Willie Mae Huggins and James Overton, who were dating at the time. Willie Mae Huggins, testifying on behalf of plaintiff, confirmed plaintiff's account. She said that on a number of occasions, when the two couples were together, the couples had gone into separate bedrooms, where they stayed for a number of hours. James Overton acknowledged that he and Ms. Huggins had dated but denied any knowledge of plaintiff and defendant ever having dated. Ms. Huggins also testified that shortly after the birth of the first child, Terrance, *174 defendant admitted to her that Terrance was his son.
Plaintiff testified that after she began "showing" with Terrance in December or January of 1967, she and defendant saw less of each other until the child's birth. According to plaintiff, she and defendant began dating in secret after Terrance's birth because her parents no longer wanted her to see defendant. The second child, Derek, was born on April 13, 1969. Plaintiff testified that from July of 1966, through April 13, 1969, the date of her second son's birth, she never dated nor had sexual relations with any person besides defendant.
At trial, plaintiff claimed that defendant had given her a money order to pay for the hospital bill when Terrance was born. Defendant denied this. Plaintiff also claimed that defendant had paid some of Terrance's other medical bills. In support of this, she introduced the records of a pediatrician which showed that the billing ledger for plaintiff's account was initially addressed to defendant. Defendant's address, however, was scratched out with the notation, "Father said he is not responsible for the billsBe sure to tell mother and get her address." The records did not reflect the date of this notation. Plaintiff testified that, on occasion, defendant had sent the two boys Christmas presents. She also testified that defendant had paid for a trumpet which she had purchased for Terrance. As evidence of the Christmas presents, plaintiff introduced copies of two money orders, each made payable to one of her sons in the amount of $10.00. Defendant admitted his signature on the money orders, but did not recall sending them. Defendant denied ever sending Christmas presents or paying medical bills. He did admit, however, that he may have, on one or two occasions, sent a few dollars after plaintiff called and asked for a loan.
At the time that he first met plaintiff, defendant was married, but he acknowledged that his wife was away at school in Baton Rouge and came home only on weekends. He was legally separated from his wife during the latter part of 1967 and was divorced in 1968. In the early part of 1967, defendant began dating another woman, Elaine Helire. According to Ms. Helire, she and defendant saw each other three or four times a week during 1967. She testified that she was unaware of any relationship between plaintiff and defendant. Ms.Helire gave birth to a daughter in August of 1968. She filed a paternity suit, but it was settled before the matter went to trial, with defendant agreeing to provide support for Ms. Helire's daughter. Plaintiff testified that Ms. Helire told her that plaintiff's sons and Ms. Helire's daughter had the same father. Ms. Helire, however, denied ever saying this.
Defendant started dating his present wife in December of 1967. Mrs. Douglas testified that she saw defendant two or three times each week throughout 1968. She said that she had no knowledge of his seeing any other woman during that time. A number of witnesses, testifying on behalf of defendant, claimed that they had never seen plaintiff and defendant out together.
At trial, Dr. Leslie Bryant, an expert in paternity testing, testified concerning paternity tests performed on defendant, plaintiff, and the two children. The tests, which were performed at Southern Baptist Hospital Blood Bank in New Orleans under Dr. Bryant's supervision, involved the detection of both red blood cell antigens and white blood cell antigens. These blood tests have a dual purpose: first, to exclude the possibility of paternity and, barring such an exclusion, to give a plausibility or probability of paternity. Dr. Bryant testified that the blood tests failed to exclude the possibility that defendant was the father of the children and established the probability of paternity at 99.9% for both children[1].

*175 ADMISSIBILITY OF THE EXPERT TESTIMONY
Defendant puts forth a number of grounds for his objection to the admissibility of plaintiff's expert testimony. Two of these concern the blood tests upon which Dr. Bryant based his testimony. In the first instance, defendant argues that, with respect to blood samples taken to perform the tests, the chain of custody was not established. Defendant cites Pearce v. Gunter, 238 So.2d 534 (La.App. 3 Cir.1970), app. not considered, 256 La. 888, 239 So.2d 543 (1970), in support of his position. That case involved a blood sample taken from a cow. The individual who took the blood sample was not called to testify, and we concluded that the party seeking to introduce the blood test had not laid a proper foundation. We explained that:
"The foundation must connect the specimen with its source, show that it was properly taken by an authorized person, properly labeled and preserved, properly transported for analysis, and properly tested."
(citations omitted), pg. 537.
In the present case, Dr. Charles Joiner testified in great detail as to the procedures he and his nurse followed in taking the blood samples. He testified that the blood samples were taken from plaintiff and her children one day and that samples were taken from defendant two or three days later. According to Dr. Joiner, on the day that he took blood samples from the mother and children, each individual was taken separately into a room where the blood was drawn and transferred to test tubes. The test tubes were then labeled before the next person was brought into the room. The blood samples from the mother and children were packed into a box which Dr. Joiner sealed. The box was then entrusted to an attorney, Wayne White, who testified that he delivered the sealed box to the Trailway bus station in Alexandria. The box was delivered by cab from the bus station to the blood bank at Southern Baptist Hospital in New Orleans, in accordance with arrangements made by personnel at the blood bank. The blood samples were stored overnight in a locker at the blood bank until they were tested the next morning.
The blood samples taken from defendant were handled in a similar fashion. Once again, Dr. Joiner testified as to the procedure followed in taking and labeling the samples. It was stipulated to by defendant that a package, represented to be defendant's blood samples, was picked up by an employee of a legal aid services office and delivered to the Trailways station to be placed on the bus for transportation to New Orleans. From there, the blood samples were delivered in the same fashion as the blood samples of the mother and children. Dr. Leslie Bryant, the doctor who supervised the blood tests, testified that any tampering with the blood samples would have been detectable. It is clear from the foregoing account that the requisite chain of evidence was sufficiently established at trial.
Defendant also contends that Dr. Bryant's testimony was inadmissible because it was based on the blood test results which were hearsay. Defendant argues that in the absence of testimony by the technologist who performed the blood tests, Dr. Bryant could not testify as to the results of the blood tests nor base his opinion upon them.
"The character of the evidence upon which an expert bases his opinion is ordinarily a matter which affects the weight to be accorded the expert's opinion. It has no bearing upon the admissibility of the evidence. Accordingly, doctors may refer to reports on the patient prepared by other doctors or nurses as a basis for their expert medical opinion."
(citations omitted)
State v. Fallon, 290 So.2d 273, 291 (La. 1974).
Dr. Bryant testified that it was standard procedure for technologists to perform the blood tests and then for the physician to interpret the results. Dr. Bryant also testified that the technologist *176 who performed the tests worked under his supervision and followed procedures designed to assure the reliability of the tests. The test results were data of a type reasonably relied upon by experts in Dr. Bryant's field in forming opinions or inferences, and Dr. Bryant could testify in reliance on that data even though it was not, itself, admissible evidence. See Federal Rule of Evidence 703.
Defendant's last objection to the admissibility of Dr. Bryant's testimony arises from the particular construction which defendant gives to LSA-R.S. 9:397. Defendant contends that by providing that the tests are to be conducted by court appointed "experts," the statute requires that at least two experts be appointed by the court. Defendant maintains that since the court only appointed one expert in the present case, the testimony of that expert was inadmissible. We disagree. Preliminarily, we note that the statute's reference to experts does not necessitate the conclusion that the trial court is required to appoint at least two experts. More importantly, the legislature has amended R.S. 9:397 to provide that the tests are to be conducted by a court appointed "expert or experts." This amendment, making it explicit that a court may appoint in its discretion any number of experts, including one, is procedural in nature, and we will give it retroactive effect. Such a procedural or remedial law should be given retroactive effect in the absence of any language showing a contrary intent. Ardoin v. Hartford Accident & Indemnity Co., 360 So.2d 1331 (La.1978).

DID PLAINTIFF FAIL TO CARRY HER BURDEN OF PROOF?
In finding that plaintiff failed to carry her burden of proof, the trial court correctly pointed out that plaintiff's burden of proof was to prove her case by a preponderance of the evidence. This is the burden of proof in a paternity suit where the alleged father is alive. LSA-C.C. Art. 209. In its reasons for judgment, the trial court indicated that the medical evidence was not substantiated by the lay testimony. In this regard, we feel that the trial court was clearly wrong.
The unrebutted testimony of Dr. Leslie Bryant was that the blood test established a 99.9% possibility or probability of paternity. Standing alone, this is strong evidence, but there was also corroborating testimony. Plaintiff testified that she and defendant had had a sexually intimate relationship during the time that her two sons were born and that defendant was the only man with whom she had sexual relations during that period of time. Her testimony was corroborated by the testimony of Willie Mae Huggins, who claimed to have been with plaintiff and defendant on a number of occasions when plaintiff and defendant had spent hours alone in a bedroom. Ms. Huggins also testified that plaintiff and defendant had a close relationship during that period of time when plaintiff's two sons were conceived, and that plaintiff had not dated any other man during that time. Additionally, Ms. Huggins claimed that the defendant had acknowledged that plaintiff's son, Terrance, was his child. Defendant, himself, admitted to having sexual relations with plaintiff, albeit only once and some ten and one-half months before the birth of Terrance. There was clearly evidence to corroborate the medical evidence and viewed together, this lay testimony and medical evidence establish that defendant was the father of plaintiff's two children.[2]
*177 A number of witnesses testifying on behalf of defendant claimed to have no knowledge of plaintiff and defendant dating. Several also testified that they had never seen plaintiff and defendant out together. All of this is in the nature of negative evidence, the weakness of which is demonstrated by the testimony of defendant's own witness, James Overton, who testified that, in fact, plaintiff and defendant were part of a group of people who went out together at that period of time. Although he said he could not say whether plaintiff and defendant were in fact out with each other, his testimony indicated that plaintiff and defendant were out with the group and would have, in all likelihood, been seen together by anyone present.
Willie Mae Huggins had testified that she and James Overton had, on a number of occasions, gone over to defendant's house when plaintiff and defendant were there. The trial court seemed to feel that Overton's testimony contradicted this testimony of Ms. Huggins and was entitled to more credibility. In fact, Overton merely testified that he did not, from his own personal knowledge, know that plaintiff and defendant had an intimate relationship. When defendant's attorney asked him if plaintiff and defendant had ever gone out alone or dated each other, his answer was: "And here again I guess when you say out alone, no, there were times when all of us were together." The fact is that he never did directly contradict Ms. Huggins's testimony. In view of the medical evidence and the corroborating testimony of plaintiff and Ms. Huggins, the trial court was clearly wrong when it found that plaintiff had failed to carry her burden of proof.
Having proven that defendant is the father of her two children, plaintiff is entitled to an award of child support. Since the record before us is inadequate for us to make such an award[3], we will remand this matter to the trial court for the taking of further evidence and the fixing of child support.

DECREE
For the foregoing reasons, the judgment of the trial court is reversed, and this case is remanded to the trial court for action consistent with this opinion.
All costs are to be paid by defendant-appellee.
REVERSED AND REMANDED.
DOMENGEAUX, J., dissents and assigns written reasons.
DOMENGEAUX, Judge, dissenting.
Basic to the review of this appeal is our responsibility to adhere to the manifest error rule. I respectfully suggest that my brothers of the majority have veered away from that concept in an effort to establish filiation to the defendant. I do believe that they have erred in that respect.
The trial judge in lengthy and thorough reasons for judgment meticulously recited the pros and cons of this case, detailing all of the circumstances surrounding it and the divergent testimonies contained therein, and summed it up as follows:
"Plaintiff waited over 15 years after the birth of her second son before instituting this action. During this time it appears that plaintiff was the only person connecting her children to the defendant, a connection the defendant consistently denied. Only one other witness puts them together as the times of conception, and her testimony was flatly contradicted by the only other person who was supposed to have been present. Plaintiff's other lay testimony was primarily based on hearsay and most of that seemingly originated with her. Witnesses who could have known of a relationship between plaintiff and defendant and between defendant and the children were not called, and those called on defendant's behalf who knew both parties denied knowledge of any relationship between them. During *178 the entire lives of the children the defendant has never admitted or acknowledged paternity; has never visited with or given any outward appearance that he is their father; has never contributed to their support and has consistently denied that he was the father. Plaintiff has clearly failed to establish her burden of proof by preponderance of the lay testimony. If anything, the preponderance of the lay testimony is that defendant is not the father of these children."
Concerning the blood test results as testified to by Doctor Bryant, it is interesting to note that the doctor on cross examination stated in the following colloquy:
"Q. Doctor, as I understand it, you can exclude paternity as a scientific fact; is that correct?
A. I can exclude paternity as a scientific fact.
Q. Yes.
A. Correct.
Q. But proving paternity is a matter of statistics; is that not also correct?
A. We can't prove paternity period." (Emphasis mine).
The trial judge's analysis and conclusions concerning the outwardly impressive percentage figures used by Doctor Bryant are reproduced as follows:
"In addition to the lay testimony plaintiff has introduced the results of blood tests made by Dr. Leslie Bryant on blood drawn from herself, her two children and the defendant. The blood was drawn by Dr. Charles Joiner in Alexandria, Louisiana, and shipped to Dr. Bryant at the Southern Baptist Hospital in New Orleans, Louisiana, where the tests were run. Although defendant has objected to the introduction of the depositions of Dr. Joiner and Dr. Bryant and to the introduction into evidence of the results to the objections. Suffice it to say that after an opportunity to review the depositions and the tests the Court is of the opinion that defendant's objections should be overruled. The chain of evidence to which the defendant objects is clearly established.
These tests show that there is a 99.9% probability that the defendant is the father of the children. At first glance such a probability factor appears overwhelming. Certainly if the lay testimony were favorable to the plaintiff's case or even if it were inconclusive such a high probability would be given great weight. However, whereas in this case, the evidence as a whole is unfavorable to plaintiff's case then the fact there is a high plausibility that defendant could be the biological father of the children cannot, without other creditable evidence, establish paternity by a preponderance of the evidence. State vs Wiggins, 409 So.2d 1264 (La. App. 2nd Cir.1982) and State vs Sharplin, 431 So.2d 864 (La.App. 2nd Cir.1983). A review of Dr. Bryant's deposition justifies such a conclusion. Initially it should be noted that paternity cannot be proven by blood testing. What blood testing does is give a probability of paternity. Based on the statistics used in this case 99.9% of all black males in North America could be excluded and defendant fell into that 1/10th of one percent that could be the father of the children. Although the probability for both children was 99.9% there was striking difference in the paternity index on each child. The oldest child had an index of 2,365 to 1, which, according to Dr. Bryant, means that the defendant is 2,365 times more likely to be the actual father than the random black male in North America. Put another way, one out of every 2,365 black males in North America could be the father. On the youngest child the index was 3,793 to 1.
In conclusion, the probability of paternity raised by the blood test is in no way certain and is not substantiated by the remainder of the evidence in this case. Accordingly, judgment is rendered herein dismissing plaintiff's suit at her cost."
The trial judge obviously was not convinced of the consistency of the blood tests and the variance of the indexes of the first child as compared to the second child. It *179 would seem that the indexes of the two children should be the same, if in truth and in fact they were full brothers out of the same mother by the same father2365 to 3793 seems significant. I can't fault the trial judge for raising his eyebrows on this disparity.
Even though we were to give Doctor Bryant's testimony the weight which plaintiff suggests that we do, blood test results provide only one method of proof in paternity actions, and are insufficient by themselves to establish paternity. Jacob v. Jacob, 417 So.2d 1367 (La.App. 4th Cir.1982); O'Bannon v. Azar, 435 So.2d 1144 (La. App. 4th Cir.1983). The fact that the trial judge forcefully discredited the plaintiff's credibility and that of her witnesses generally, should leave us with the inescapable duty to affirm the trial judge and not second guess him.
I respectfully dissent and feel that the decision of the trial court should be affirmed.
NOTES
[1] The actual paternity index for Terrance Bailey was 2,365 to 1. Dr. Bryant testified that this meant that defendant was 2,365 times more likely to be the actual father than a randomly chosen male. The paternity index for Derek was 3,793.1.
[2] For a case very similar to the one now before us, see Jones v. Thibodeaux, 445 So.2d 44 (La. App. 4 Cir.1984). Coincidentally, Dr. Bryant was the only medical expert to testify in that case. There he found that the probability of the defendant being the father of the child was 99.8%, slightly less than the 99.9% he testified to in the case before us. In Jones, the evidence produced by plaintiff, in addition to the blood test evidence, included: her testimony about the sexual relationship which existed between her and the defendant and her testimony that defendant had visited her in the hospital after the child was born. As in the present case, the defendant admitted to having sexual intercourse with the plaintiff, but testified that the relationship between them had come to an end some months prior to conception.
[3] In this regard, the chief inadequacy is that the record indicates that defendant's wife has an income but contains no evidence of the amount of that income.