519 So.2d 362 (1988)
STATE of Louisiana, Appellee,
v.
Daniel BOLDEN, Appellant.
No. 19280-CA.
Court of Appeal of Louisiana, Second Circuit.
January 20, 1988.
*363 Leroy Smith and Oscar Labarre, Tallulah, for appellant.
William J. Guste, Jr., Atty. Gen., Barbara B. Rutledge, Asst. Atty. Gen., Baton Rouge, James D. Caldwell, Dist. Atty., David Baughn, Asst. Dist. Atty., Tallulah, for appellee.
Before MARVIN, JASPER E. JONES and LINDSAY, JJ.
LINDSAY, Judge.
The state of Louisiana brought this suit against Daniel Carl Bolden, Jr., pursuant to LSA-R.S. 46:236 et seq., to establish the paternity of Frances Henton, a minor child born to Ruth Henton, a recipient of Aid to Families with Dependent Children (AFDC), and to obtain a judgment of child support. The trial court found the defendant to be the child's father and ordered him to pay child support. The defendant appealed from this judgment. We affirm.
FACTS
The child, Frances Henton, was born on July 25, 1984. Her mother, Ruth Henton, met the defendant in 1982. The defendant is a married man, but he and his wife do not have children.
The defendant and Ms. Henton's brother-in-law were members of the same gospel singing quartet. Ms. Henton was often present at rehearsals and performances of this group and she and the defendant became friends.
In approximately October, 1983, the friendship of the defendant and Ms. Henton evolved into a sexual relationship which resulted in her pregnancy. Ms. Henton testified that she conceived in late October or early November of 1983. She maintained that she did not engage in sexual relations with anyone other than the defendant for three months before and three months after the conception of the child. Ms. Henton further stated that the defendant professed to be happy about her pregnancy because the child would be his first. She testified that the defendant gave her a small amount of money to cover some of her expenses.
Ms. Henton's testimony was corroborated by that of her sister, Cora Dean Fletcher, and her mother, Ann Henton. Mrs. Fletcher testified that she knew the defendant because he and her husband were in the same gospel singing group. Ms. Henton and the defendant first met at Mrs. Fletcher's house. Mrs. Fletcher recounted conversations with the defendant in which he asked her if Ms. Henton had other boyfriends and whether she thought he was the child's father. Mrs. Fletcher further testified that the defendant admitted to her and members of the gospel group that the child was his. He also said that the child bore a resemblance to his family.
Ann Henton testified that she lived with her daughter, Ruth Henton, and Ruth's children. (In addition to Frances, Ms. Henton has two other illegitimate children.) Ann Henton testified that she had known the defendant for about three years. On two or three occasions she saw her daughter and the defendant enter her daughter's bedroom and remain there for some time. After several of these events, her daughter informed her of her pregnancy. The defendant was the only man coming to the Henton residence at that time.
Ann Henton also testified that the defendant admitted paternity of the child.
*364 He claimed to be happy, since he had no other children. She stated that when the child was about three weeks old, the defendant came to visit and inquired as to what was needed for the child.
The defendant admitted engaging in acts of sexual intercourse with Ms. Henton. However, he claimed that it was highly unlikely that he could father a child. He and his wife of eighteen years never had any children. Medical examinations of the defendant and his wife allegedly revealed that his wife was able to conceive, but the defendant had a low sperm count. The results of the defendant's sperm count tests were admitted into evidence by stipulation of counsel. He conceded that the low sperm count test results were his only basis for denying paternity of the Henton child.
A blood test was performed on samples of blood of the child, her mother, and the defendant. These test results were also admitted into evidence by stipulation of counsel. They showed that the relative chance of paternity was 99.71 percent probable that the defendant was the father of the child. The report concluded that "[p]aternity is extremely likely."
Based upon all the evidence, the trial court found the defendant to be the child's biological father and ordered him to pay $200 per month in child support. He was further ordered to pay an additional $50 per month to the state of Louisiana on previous AFDC payments, and to pay court costs and the costs of the blood tests. The defendant has appealed the trial court judgment.

ASSIGNMENTS OF ERROR
In his appeal, the defendant relies upon two assignments of error. The defendant contends:
(1) the trial court erred in finding that he was the father of the child; and
(2) the trial court erred in according too much weight to the blood tests, and in placing the burden of proof on him once the blood tests were introduced.

FIRST ASSIGNMENT ASSIGNMENT OF ERROR
In his first assignment of error, the defendant argues that the trial court erred in finding that he was the father of the child. He contends that the trial court decision is not supported by, and is contrary to, the law and the evidence. We disagree.
The state has the burden of proving the defendant's paternity of the child by a preponderance of the evidence. LSA-C.C. Art. 209; State through the Department of Health and Human Resources in the Interest of Johnson v. Rice, 482 So.2d 873 (La.App. 2d Cir.1986). In the instant case, the trial court correctly determined that the state had carried its burden of proof.
The mother testified that the defendant was the child's biological father. She adamantly maintained that the defendant was the only man with whom she had sexual relations at the approximate time of conception. The defendant produced no evidence to the contrary. Additionally, the defendant himself admitted that he and the mother engaged in sexual intercourse during the approximate time of conception, although he was uncertain of the exact dates. This admission corroborated Ms. Henton's testimony. The mother's testimony about the relationship of the parties was further corroborated by that of her mother, Ann Henton, and her sister, Mrs. Fletcher. Both of these witnesses testified about the relationship of the parties and the defendant's admission that he was the father of the child. Further support that the defendant is the child's father was provided by the scientific evidence of the blood tests, the results of which established that paternity was "extremely likely."
In contrast to the evidence outlined above, upon which the trial court relied in reaching its decision, the defendant contends, in his brief, that he last saw Ms. Henton in April, 1984, prior to the child's birth, and that he did not see her thereafter. However, this allegation is contradicted by his own testimony. At trial, the defendant admitted that he had visited Ms. Henton after the child was born. (T. 101)
*365 The defendant also contends he never acknowledged the child, as testified by the state's witnesses. In this context, the defendant asserts that the state's witnesses were not credible. He particularly points to the testimony of Ms. Henton's sister, Mrs. Fletcher, and her mother, who allegedly both testified that the defendant wrote a letter to the Welfare Department in which he admitted paternity of the child. However, no letter was admitted into evidence at trial. Thus, the defendant argues that the testimony of these witnesses should be considered suspect. We note that Ms. Henton's mother made no reference to any letter in her testimony. Ms. Henton and Mrs. Fletcher were the only witnesses to testify on this point.
While no letter was admitted into evidence, this is merely one of many factors considered by the trial court in assessing the credibility of the witnesses. The trial court's determination of factual and credibility issues should not be disturbed by an appellate court in the absence of manifest error. State through the Department of Health and Human Resources, in the Interest of Johnson v. Rice, supra; State through the Department of Health and Human Resources, Support Enforcement Services and Interest of Miller v. Smith, 459 So.2d 146 (La.App. 2d Cir.1984); Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978), on remand 370 So.2d 1262, writ denied 374 So.2d 660 (La.1979); Canter v. Koehring, 283 So.2d 716 (La.1973). In this case we find no error in the trial court's credibility determination.
The blood tests which were admitted in evidence by stipulation revealed that there was a 99.71 percent probability that the defendant was the father of the child and that "paternity is extremely likely." Nevertheless, the defendant contends that the reports of his low sperm count "disagree" with the blood test findings and that the provisions of LSA-R.S. 9:397.3(D) are therefore applicable. He further contends that since there is "disagreement" among the "experts," the state failed to introduce sufficient, additional evidence to prove paternity.
LSA-R.S. 9:397.3(D) is included in the Uniform Act on Blood Tests to Determine Paternity. The statute provides:
D. If the court finds that the conclusions of all the experts as disclosed by their reports, based upon the tests, are that the alleged father is not the father of the child, the question of paternity shall be resolved accordingly. If the experts disagree in their findings or conclusions, the question shall be submitted upon all the evidence. The tests and the testimony of the mother alone shall not be sufficient grounds for determining that the man is the father of the child.
The provision of this statute, which provides that the tests and the testimony of the mother alone are not sufficient for determining paternity, clearly becomes applicable when there is disagreement among experts who have conducted the blood tests in question. The defendant would have us expand the meaning of the statute to include as "experts" his doctors who conducted the sperm count tests. This we cannot do. According to LSA-R.S. 9:397, an expert is one qualified as an examiner of blood samples for inherited characteristics. In the present case, only one expert within the meaning of the statute was involved, that being the expert who supervised the blood tests, and who determined that the defendant's paternity is "extremely likely."
We also note, of course, that the record reveals that in addition to the results of the blood tests and the mother's testimony, there was considerable corroborating evidence, all of which is outlined above. The evidence supports the decision of the trial court.
Accordingly, this assignment of error has no merit.

SECOND ASSIGNMENT OF ERROR
The defendant's second assignment of error is closely related to the first. He claims that the trial court placed undue emphasis on the blood tests in view of his low sperm count test results. He contends that those sperm counts reveal that he was sterile or very nearly sterile and that therefore he could not be the father of the child.
*366 The defendant had four such tests. The first test in September of 1982, showed a sperm count of 65,800,000 per cubic centimeter.[1] On May 17, 1985, another test showed a count of 20,800,000 per milliliter, and a test conducted on May 31, 1985, showed a test result of 12,300,000 per milliliter. The final test, made just a few days before trial, showed a sperm count of 50,700,000 per cubic centimeter.
No expert witness testified on behalf of the defendant to explain the numbers shown in the test results. However, by stipulation of counsel, a copy of an article on "Seminal Fluid" by Dr. Donald C. Cannon in Clinical Diagnoses and Management by Laboratory Methods, 17 Ed., W.B. Saunders Company, 1984, was admitted into evidence. In it, Dr. Cannon states:
Although it was formerly thought that sperm counts of less than 20 million per ml are abnormal, several recent studies of presumably fertile males clearly refute this assumption. The largest such study (Smith, 1978), involving 2543 males, indicates an overall range of 100,000 to 375 million per ml with a mean of 70 million and 19 per cent of individuals with counts less than 20 million. Sperm concentration increases with abstinence for at least the first 10 days with a daily incremental increase of 13 million per ml (Schwartz, 1979).
The defendant has provided no interpretation of the sperm count test results except that which may be drawn from the above quoted excerpt. Based upon this information, it does not appear that the defendant was sterile and unable to father a child. All we can determine is that his sperm count may be deemed low by some standards. However, the evidence does not indicate that it was impossible, or even improbable, for the defendant to be the father of the child.
We also find no merit to the defendant's claim that the trial court improperly transferred the burden of proof to the defense after the admission of the blood tests. During the trial, once the state presented a prima facie case by a preponderance of the evidence, the defendant then had the opportunity to produce evidence to rebut the state's case. The defendant was given every opportunity to present his evidence in opposition to that introduced by the state. The defendant's evidence was simply not sufficient to overcome the state's case. The burden of proving its case by a preponderance of the evidence was always on the state. The trial court's reasons for judgment show that the court did not require the defendant to disprove paternity. To the contrary, the record shows that the trial court considered all the evidence in arriving at its decision and concluded that the state had proved paternity by a preponderance of the evidence. We see no error in the trial court judgment.

CONCLUSION
Accordingly, for the foregoing reasons, the judgment of the trial court finding the defendant to be the biological father of Frances Henton and ordering him to pay monthly child support is affirmed at the defendant's cost.
AFFIRMED.
NOTES
[1] According to the metric system table in Webster's Nineth New Collegiate Dictionary, one cubic centimeter (cc) and one milliliter (ml) are each equivalent to about 0.061 cubic inch.