550 So.2d 866 (1989)
STATE of Louisiana in the Interest of Mary BRADEN, Appellee,
v.
Robert E. NASH, Jr., Appellant.
No. 20846-CA.
Court of Appeal of Louisiana, Second Circuit.
September 27, 1989.
*867 Davenport, Files & Kelly by Thomas W. Davenport, Jr., Monroe, for appellant.
William J. Guste, Jr., Atty. Gen., James A. Norris, Jr., Dist. Atty., D. Gregory Miller and Carol S. Patterson, Asst. Dist. Attys., Monroe, for appellee.
Before MARVIN, NORRIS and LINDSAY, JJ.
NORRIS, Judge.
The defendant, Robert E. ("Robbie") Nash Jr., appeals a judgment declaring him the biological father of a child named Mary Braden, who was born to an unwed mother currently receiving Aid to Families with Dependent Children. The defendant urges the trial court erred in:
(1) finding by a preponderance of evidence that the defendant and the mother had sexual intercourse during the probable conception time;
*868 (2) placing reliance upon and accepting as credible the blood test results and findings of Roche Biomedical Laboratories; and
(3) finding by a preponderance of evidence that the defendant is the father of the child.
The trial court rendered excellent written reasons for judgment that carefully and thoughtfully analyze all the evidence. These reasons, we feel, effectively answer the arguments advanced by this appeal. We therefore adopt them as our own, as printed below, and supplement them for the sake of clarity. For the reasons expressed, we affirm.

Trial court's reasons for judgment
This action was commenced by the state of Louisiana on October 28, 1987, against Robert E. Nash Jr., under the authority of LSA-R.S. 46:236 et seq., to establish the paternity of Mary Braden, a minor child born January 25, 1987, to Deborah Braden, a recipient of Aid to Families with Dependent Children (AFDC). Fifteen persons, including the child's mother and the defendant, testified as witnesses during the trial of the case on April 4 and 5, 1988. The facts of this case were highly disputed and contested at the trial. A review of the evidence by this court establishes the following scenario of events.
The defendant is from Pineville, Louisiana. He is single, 23 years of age and expects to graduate from Northeast Louisiana University in May 1989 and receive a commission as an officer in the United States Army. Ms. Braden is single, 28 years of age and is pursuing a career in nursing. She has another child, also the result of a non-legal union, born in 1978. She has been pregnant four times, but miscarried twice.
Ms. Braden and the defendant were full-time students at NLU during the 1985-1986 school year. Although they were in pursuit of different careers, they were introduced and came into contact with each other through association with the ROTC Department on that campus.
In August 1985, Ms. Braden and one Guy McDaniel, a fellow-student and friend of the defendant's, began dating on a regular and frequent basis. By her own admission, they engaged in sexual intercourse with each other twice a week. In January 1986, Ms. Braden began taking an oral contraceptive and stopped taking it in late March. This romance lasted until the annual military ball on April 11, when their relationship ended because she was interested in a marriage and he wanted no part of it. According to McDaniel, this was the last time he and Ms. Braden had sexual intercourse with each other. She claims that she had sex with him on her birthday, September 10, 1986.
After her breakup with Mr. McDaniel, she and the defendant began seeing each other. Mr. Nash claims that she began "making passes" at him, that he resisted for a while and then relented. On May 1, he and Ms. Braden had sexual intercourse with each other for a period of 20 minutes in her dormitory room. He insists that this was the first and only sexual incident between them. Ms. Braden claims they had sexual intercourse on April 27 in his dormitory room, again on May 1 in her room, again on May 6 in her room, again on May 9 in her room and, for the last time, on May 14 in her room, when he spent the entire night and next morning with her.
On December 16, 1987, Ms. Braden, Mary Braden (the child at issue) and the defendant submitted to blood sampling and testing by Roche Biomedical Laboratories, which had been ordered by the court on October 29 and December 14. The report of the test results was filed in the suit record January 12, 1988, and introduced in evidence as part of the state's evidence over objection by the defendant. The results of these tests reflect a combined paternity index of 1107 to 1 and a very high probability of paternity of 99.90% that Mr. Nash is the biological father of Mary Braden.
Dr. R. Scott Foster, the director of Roche and an expert in paternity testing, testified that the two groups of tests, red *869 cell antigens and human leukocyte antigen (HLA), performed on the blood samples of the mother, child and alleged father, resulted in the above findings. He explained that the testing results are examined and interpreted as a process of elimination of paternity, so that if the child and the alleged father do not share the same genes, then the alleged father would be excluded. The term "combined paternity index" refers to the likelihood of what is known, measured against an untested male population. In this case, the index of 1107:1 means that the probability of another male having the same gene scale as Mr. Nash is 1 in 1100. It was Dr. Foster's opinion that, for this to have occurred, Ms. Braden would have had to have intercourse with 1100 other men in a three-day period.
Dr. Allen Pelletier, a local physician who followed Ms. Braden during her pregnancy, first saw her on June 20, 1986. She told him that she had used an oral contraceptive from January to late March and that she had been sexually active in late April, early May and again about May 17. Her last menstrual cycle had been sometime in March. On June 16, Ms. Braden was examined at the E.A. Conway Hospital High Risk OB Clinic. She had a positive serum pregnancy test, but there was no ultrasound documentation of such. She returned June 23 and ultrasound demonstrated evidence of pregnancy (gestational sac) and an estimated gestational age of 7-8 weeks. According to Dr. Pelletier, in order to establish the probable conception date, the gestational age, which is the duration of pregnancy calculated from the first day of the last normal menstrual cycle, is determined through ultrasound, the use of high frequency sound waves. If it is used early, between 7-14 weeks, it is quite accurate, having only a margin of error of 5%, or 1 to 4 days either way. Fertilization age, the moment that an egg and sperm unite, usually comes 14 days after the beginning of gestation. Ms. Braden's case presented some difficulty because her last normal menstrual cycle could not be accurately determined because she had stopped taking birth control pills; this, according to Dr. Pelletier, frequently results in derangement of the menstrual cycle and makes ovulation and fertilization very unpredictable. It is very common for women to stop the birth control pill and not have a period for several months or to have irregular or erratic periods for up to six months. Therefore, it was necessary to rely on ultrasound to date gestation. He estimates the time of conception to be on or about May 17, based upon the history of sexual activities she gave him and the ultrasound test of June 23.
Because there was no ultrasound documentation on June 16, Dr. Pelletier ruled out the likelihood of conception on or before May 1. But using his formula and the gestation age of the fetus on June 23 at from seven to eight weeks, gestation would have begun between April 28 and May 5, or between April 24 and May 9, if you factor in the margin of error. The court calculates that conception could have occurred as early as May 8 and as late as May 23. On July 23, ultrasound testing showed the gestation age of the fetus to be 12 weeks. This would establish conception sometime between May 11 and 18.
In support of her allegations as to the times and places she and the defendant engaged in sexual intercourse, Ms. Braden testified that on the night of May 14 she and the defendant had gone with others to a local nightclub together and had returned to her dorm room, where she and defendant had sexual intercourse and spent "all night" with each other in her room. She called three witnesses to corroborate her testimony. The first, a Phyllis Fisher, then the assistant dormitory manager of Masur Hall and a suitemate of Ms. Braden, testified that she knew and was acquainted with both the defendant and Guy McDaniel. The last time she saw McDaniel in Ms. Braden's room was in April. She saw the defendant in Braden's room frequently and received his telephone calls on three to four occasions. In one instance, the defendant attempted to gain entrance to *870 Braden's room without success and asked Ms. Fisher for assistance, but was told Braden did not want to see him. Ms. Fisher specifically remembers the evening of May 14 and that Braden had no other male visitors. She did not personally see the defendant in Braden's room, but she heard conversation and sound, movement and noise to indicate his presence. The next morning, she observed defendant's truck in the dormitory parking lot. Tracy Redding Wingerter, Ms. Fisher's roommate and Ms. Braden's suitemate, testified that she met the defendant at the end of April and had observed him with Braden in her room at various times during the early part of May. On one occasion, she helped him with a math problem. Maurenne Mullins testified by deposition that she was acquainted with the defendant and was a friend of Ms. Braden's. On the evening of May 14, she observed them together in Freddie's Lounge between 9:00 and 11:00 p.m. When she returned to her dormitory, she saw defendant's pickup truck with a red motorcycle and things loaded in it parked in a parking lot in front of the dormitory. The next morning, May 15, she observed Ms. Braden and the defendant leave Braden's room between 8:00 and 10:00 a.m. She is certain of this because she wanted to borrow some hairspray, and when she saw them leaving together, she decided to leave well enough alone. She is also positive that Braden was with the defendant and not someone else at this time.
The defendant, Robert E. Nash Jr., has steadfastly denied that he is the father of Mary Braden. He has never admitted to anyone that he is, or could be, her father. He was not present at the child's birth and has not spoken to Deborah Braden since late May or early June after a confrontational meeting at his home in Pineville, when she told him of her pregnancy. He has never supported or offered to support the child. He testified that, during the summer while he was stationed at Ft. Riley, Kansas, he received a letter from Ms. Braden reportedly stated that she apologized for blaming him as the father, and that she was going to confront Guy McDaniel as the father. Ms. Braden acknowledged the letter, but denied its contents. Defendant testified he destroyed the letter out of concern for his military career.
Other witnesses called by the defendant, including Guy McDaniel, testified that at various times Ms. Braden believed McDaniel was the child's father. In fact, she herself hoped that it would be his child. But all this testimony is for naught because Dr. Pelletier has ruled out the possibility that McDaniel is the father by his estimated conception date and the testimony of McDaniel and Ms. Braden that their last incident of intercourse was on April 11. What Ms. Braden hoped for or wanted is of no moment here.
In defense of Ms. Braden's evidence that they had sexual intercourse on May 14, the defendant testified that on this date he and other persons were together drinking beer until dark at Bayou Bartholomew several miles north of the NLU campus. At dark, they returned to Monroe and went to Matt Stewart's dorm room in Sherrouse Hall, where they continued partying and ate crawfish. He slept in Stewart's room that night and left for Pineville the morning of the 15th. He denies that he went to Freddie's Lounge or slept with Ms. Braden the evening of the 14th. He denies parking his truck at Masur Hall.
In support of his whereabouts on May 14, defendant offered the testimony of Vaughan Bryant, Michael Monk and Matt Stewart. Bryant has known the defendant for two years and testified that at noon on May 14 he, the defendant and Stewart left in his car and went to Bayou Bartholomew where they swam and drank beer until about dark and then returned to Sherrouse Hall where they continued drinking beer and ate crawfish. The three of them spent the night in Stewart's room. On cross-examination, he admitted that he might have the evenings of the 13th and 14th mixed up or confused, and who he was with, admitting to drinking too much beer. Monk *871 testified that he could not have been at Freddie's Lounge the night of the 14th, because he spent that night and the night of the 15th in Shreveport.
The testimony of Matt Stewart, also a friend of the defendant's, was taken by telephone deposition and initially it supports the testimony of the defendant and Bryant about their activities on May 14. However, when subjected to adroit cross-examination by counsel for the state, it is very apparent from reading the deposition that Stewart became very defensive in his answers. Eventually, his version of what he, Bryant and the defendant did on the 14th was actually done on the 13th. On page 13, he was asked the following question:
"Q. All right. I believe you had testified that finals were given on Monday, the 12th, and Tuesday, the 13th. Is that correct?
"A. I took that information from the court. All I can recall is that after finals were over that day, we started drinking. We were in my room. Then there was three of us when Mr. Vaughan [sic] came over, and we spent the night there. The next day, we all left for home."
Examining the testimony of Ms. Braden, Phyllis Fisher, Maurenne Mullins, the defendant, Vaughan Bryant, Mike Monk and Matt Stewart together, once all of the "rabbit trails" have been explored, the court concludes that according to defendant's Exhibit (D-1), final exams ended Tuesday, May 13, 1986, at 2:50 p.m. It is more reasonable to conclude that any celebration would have begun the 13th rather than the next day. Therefore, the court finds that the Bayou Bartholomew party took place the afternoon of the 13th, that the party continued that evening in Sherrouse Dormitory and that Vaughan, Stewart and the defendant slept and spent that evening in Stewart's room.
The events of the evening of May 14th and the morning of May 15th happened essentially as Ms. Braden testified. They were all corroborated by evidence presented by the state. Evidence to the contrary now remains only in the form of the defendant's denials.
The state bears the burden of proving by a preponderance of the evidence that the defendant is the father of the child. LSA-C.C. art. 209 A; State v. Bolden, 519 So.2d 362 (La.App. 2d Cir.1988).
In reaching its decision, this court considered as relevant factors evidence, or lack of evidence, that (1) the mother and alleged father engaged in sexual intercourse; (2) the date on which conception occurred; (3) scientific paternity testing; (4) informal acknowledgment of the child by the alleged father; (5) support, either financial aid or in-kind of the child by the alleged father; (6) Ms. Braden's promiscuous sexual behavior and her involvement with other males; (7) the date when legal action was instituted; and (8) the age of the child. These factors and any others the court may have failed to mention, if established alone, do not satisfy the burden of proof. In fact, admitted blood tests, while prima facie proof of their contents, coupled with the testimony of the mother alone, are not sufficient to establish paternity. LSA-R.S. 9:397.3. They are important factors which must be weighed with all the evidence presented at trial. All these factors have been discussed in some detail earlier in these reasons and further elaboration is not required, except to place the evidence in its proper perspective.
The promiscuous and immoral sexual behavior of Ms. Braden was considered as a factor in this case. It placed her in a very tenuous position with the court, and it certainly went to the weight and credibility of her testimony. The realities of life and nature tell us that illegitimate children are more often than not the ultimate result of such conduct. The laws of Louisiana favor legitimation. In this case, however, there was no evidence offered that Ms. Braden had been sexually active with any male other than Mr. McDaniel and the defendant from September 1985 through May 15, 1986.
The sexual relationship between Ms. Braden and the defendant, Mr. Nash, was brief. He claims it lasted for only *872 several minutes on May 1. She claims it lasted over 19 days. Because their testimony is diametrically opposed, the court must look to other factors in deciding which is more worthy of belief. If the court is to accept the defendant's statement as true, then, according to Dr. Pelletier, he is not the father. If he fell so easily to Ms. Braden's charms the first time, would he not have been that much more vulnerable and tempted by her charms a second, third, fourth or even a fifth time within a two-week period, considering her admission of a preference for frequent and regular sex and the token, or no resistance, she gave him? Certainly, her testimony alone is not enough to convince the court, but the testimonies of Phyllis Fisher, Tracy Wingerter and Maurenne Mullins convince the court that the defendant engaged in sexual intercourse with Ms. Braden on more than one occasion, one of them being the night of May 14 and the early hours of May 15. The evidence presented by the defendant to the contrary could not stand the test of cross-examination and fell short of its mark.
The evidence that defendant and Ms. Braden were not seen together socially, or did not hold themselves out as "dating" or "going with each other," corroborates what the court has previously said, in so many words, that they were lovers for a brief period of time. Had Ms. Braden not become pregnant, perhaps things would have been different. The evidence that the defendant never admitted to anyone that he was the child's father, or acknowledged the child financially or in any other way, is consistent with his general denial of paternity and must be evaluated in light of the consequences of paternity to his intended military career.
As stated earlier, the testimony of Dr. Pelletier eliminates Guy McDaniel as the father and establishes the conception date within an accepted range of time that sexual intercourse between the defendant and Ms. Braden occurred.
The court has previously discussed the results of the blood testing done in this case, and finds it to have been very helpful to the court in reaching a decision. Again, the court is very mindful that it alone is not sufficient to establish paternity and, therefore, not conclusive. However, its high percentage of probability does make it persuasive.
This action was filed by the state on October 28, 1987, in the interest of the minor child, Mary Braden, slightly over nine months from the child's birth on January 25, 1988. It was not filed by or on behalf of the mother, Ms. Braden, but by the state on behalf of the child, because the mother is receiving financial aid from the state to support this child. Under the authority of LSA-R.S. 46:236.1 F, the state has a duty and obligation to take direct civil action, as it has done in this case, to establish paternity against an alleged biological parent and, thereafter, to obtain an order of support if paternity is first established. In this case, the weight of the evidence preponderates in favor of the state. The state has successfully established by the preponderance of the evidence that Robert E. Nash Jr. is the biological father of Mary Braden, and the court will grant judgment accordingly.

Assignment No. 1
By his first assignment, Nash contests the trial court's finding that he and Ms. Braden had intercourse on May 14. In support he reiterates various points of testimony that the trial court rejected. The reasons for judgment show the trial court's approach to the conflicting lay testimony. The state's witnesses, three ladies who shared a suite in a women's dorm, seemed acutely aware of each other's activities and testified with a commensurate certainty. The defendant's witnesses, by contrast, were much less certain; the passage from the phone deposition of Matt Stewart is typical. We can find no basis whatsoever for disturbing the trial court's reasonable credibility call. Canter v. Koehring Co., 283 So.2d 716 (La.1973).
Nash particularly cites Vaughan Bryant's explanation for being so sure that *873 the Bayou Bartholomew party was on May 14, not May 13. Bryant was awaiting a letter from his dean authorizing him to go on Texas A & M's Summer School in London program. The letter would not be sent until after final exams were over on May 13. Bryant picked it up from the dean's office the following day, May 14. He distinctly remembers getting the letter that day, then meeting with the defendant and Matt Stewart, going to swim at Bayou Bartholomew, returning to Matt's dorm room and spending the night there. However, on cross-examination he admitted that the same trio had another swimming party at Bayou Bartholomew on the previous day, May 13a detail not offered on direct and not mentioned by any other witness. He did not immediately recall the party of the 13th, he explained, because he was so drunk that night. He eventually admitted that the night he spent in the room with the defendant might have been May 13. R.p.p. 292-295. He insisted that his memory of May 14 was clear, but of May 13 was a "blur." In light of the equivocation, the trial court was entitled to attach much less weight to this testimony than the defense claims its deserves.
The defendant also claims that the trial court's calculation of a probable time of conception between May 8 and May 23 is "contrary to the lengthy and detailed testimony of Dr. Allen Pelletier." We do not agree. Dr. Pelletier summarized his findings at page 44 of his deposition. The positive ultrasound of June 23 meant the fetus had a gestational age of seven to eight weeks. Calculation from eight weeks yields a "most likely" conception date of May 14; from seven weeks yields May 21. The ultrasound of July 23, showing a gestation age of 12 weeks, yields dates of May 11 and 18. All figures are correct to the nearest four days. Pelletier's Dep., 12. Plainly, the trial court's calculations are consistent with, and not contrary to, the expert evidence. This assignment does not present reversible error.

Assignment No. 2
By his second assignment Nash claims the trial court should not have accepted as credible the blood test results of Roche Biomedical Laboratories. He claims that the state's expert, Dr. Foster, relied on a computer printout based on data collected by others; that Roche's tests did not comply with guidelines established by an ABA/AMA Joint Committee; and that the results were deceptively presented and interpreted.
A child not entitled to legitimate filiation or not filiated by the parent's initiative by legitimation or acknowledgment must prove filiation as to an alleged living parent by a preponderance of evidence in a civil proceeding instituted by the child or on his behalf. LSA-C.C. art. 209 A. The Louisiana legislature adopted the Uniform Act on Blood Tests to Determine Paternity in 1972. LSA-Acts 1972, No. 521. In so doing, it demonstrated a willingness to allow scientific data to assist a court in making its determinations. Leblanc v. Leblanc, 497 So.2d 1361 (La.1986). Although scientific testing alone is not sufficient to prove paternity, it is persuasive and objective testimony that can help establish proof by a preponderance of evidence. Probabilities are by their nature not conclusive, but they are useful in proving filiation in a paternity suit.
Nash's first argument is resolved by reference to the statute. LSA-R.S. 9:397.3 provides that the court may admit the written report of the blood test expert as long as all procedural guidelines have been followed. The defense does not argue that these guidelines were disregarded, and we find no evidence of noncompliance. The test results could have been admitted without the personal appearance and live testimony of an expert. See Worley v. Thirdkill, 506 So.2d 1288 (La.App. 2d Cir.1987); State in Int. of Bankston v. Davis, 521 So.2d 575 (La.App. 1st Cir.1988). If an expert does testify, however, he need not be the person who actually drew the blood, performed the tests or compiled the statistics for comparison. He may rely on data prepared by other technicians. State v. Fallon, 290 So.2d 273 (La.1974), and citations therein; Patterson v. Johnson, 509 *874 So.2d 35 (La.App. 1st Cir.1987); Bailey v. Douglas, 478 So.2d 172 (La.App. 3d Cir. 1985), writ denied 479 So.2d 365 (La. 1985); LSA-C.Ev. art. 703.
Dr. Foster testified in great detail as to the procedures followed by the technicians at Roche Laboratories. The battery of tests included a Red Cell test and a Human Leukocyte Antigen (HLA) test. Each test was performed twice, by different technicians working independently of each other to assure validity. Dr. Foster also testified as to the usual chain of custody of blood samples received by Roche. R.p.p. 194-203. The report and affidavit of Dr. Foster, filed in evidence, corroborated the chain of custody. R.p.p. 40-43. Based on this evidence, the trial court was entitled to admit and assign weight to Dr. Foster's testimony.
Nash next claims Dr. Foster's procedure was flawed for failure to include the Kidd test. Dr. Foster admitted that the 1976 ABA/AMA recommendation, never subsequently revised, included the Kidd test. He explained, however, that in 1976 the HLA test was not very strong; experts had to resort to the Kidd test. Today, he testified, the HLA test is "more discerning" and the Kidd test is actually considered "unreliable." R.p. 241. In the absence of expert evidence to contradict this, the trial court was entitled to accept Mr. Foster's explanation and assign appropriate weight to the test results.
Nash's primary argument is that the test results were deceptively presented and interpreted. He specifically relies on this court's discussion in Johnson v. Gant, 516 So.2d 1275 (La.App. 2d Cir.1987). There, the mother offered testimony of a criminalist who conducted an ABO test and set at 79% the relative probability that the defendant was the child's father. We stated,
We concede that at first glance, especially in light of the 51 percent preponderance standard of civil cases, the 79 percent figure seems impressive. Upon thorough review, however, we find this figure illusory.
As is often the case, percentages and statistics used by scientists are baffling to the legal profession. We admit to being somewhat befuddled by the scientific nature of this record, the scientific shorthand and the various probability figures which seem contradictory. 516 So.2d at 1276.
Nash asks us to consider whether, given all the facts, the instant paternity index of 99.90%, is not another "illusory" figure, and equally unreliable.
We acknowledge that paternity indices, derived from statistics as to probabilities of paternity, can sound stronger than the evidence warrants. The crucial question, however, is the quality of the evidence in the particular case. In Johnson, supra, the plaintiff's expert admitted that he performed only one kind of test, an ABO grouping of 19 blood characteristics; this yielded the 79% index. The expert admitted that other tests would be necessary to reach a conclusive finding. He stated, in fact, that his test results "did not demonstrate that more probably than not the defendant was the father." Given this state of the evidence, the trial court declined to find paternity and this court affirmed.
Other cases have rejected apparently overwhelming paternity indices on similar bases. For instance, in O'Bannon v. Azar, 435 So.2d 1144 (La.App. 4th Cir.1983), writ denied 441 So.2d 749 (La.1983), cert. denied 466 U.S. 928, 104 S.Ct. 1710, 80 L.Ed.2d 183 (1984), two experts testified. One set the paternity index at 99.91%, while the other set it at only 68% and said he found "other factors mandating exclusion." The portion of the lay evidence that the trial court accepted as credible undermined the plaintiff's claim that she and the defendant had intercourse during the probable time of conception. The trial court refused to find paternity and the court of appeal affirmed. In Suire v. Robison, 511 So.2d 35 (La.App. 3d Cir.1987), the plaintiff's expert set the paternity index at 97.28%. However, he did not perform the HLA test, which provides surer factors of exclusion. The lay evidence in support of intercourse during the probable conception period was found to be inconclusive. The trial court therefore *875 rejected the plaintiff's claims and the court of appeal affirmed. In this court's earlier case of State v. Wiggins, 409 So.2d 1264 (La.App. 2d Cir.1982), the blood tests established only that the defendant could be the father of the child. We reversed the trial court's finding of paternity.
The instant test results do not share the manifold shortcomings noted in the cases just discussed. In the first place, Dr. Foster testified that both the applicable tests were performed, and twice. He never equivocated about the strength of the 99.90% paternity index; he never referred to this as a "slight" indication. On the contrary, he steadfastly maintained that if the mother had intercourse on the date indicated, the chances that it was with someone other than Nash were one in 1100. Dr. Foster's explanation was not contradicted and was, in the trial court's estimation, "very helpful."
High paternity indices have been upheld as reliable when the tests were complete and correct, and the evidence of intercourse sufficient. See Worley v. Thirdkill, supra, where the index was 97.3%; and Williams v. Williams, 527 So.2d 1068 (La.App. 1st Cir.1988), writ denied 532 So.2d 153 (La. 1988), where the index was 99.34%. In Bailey v. Douglas, supra, the court of appeal reversed the trial court's refusal to find paternity in light of a 99.9% index and contested evidence of intercourse during the probable conception period.
Nash finally adds that the margin of error in the tests was unacceptably high. He argues that the test includes three elements, each having a 95% level of confidence, or a 5% margin of error, which is "within scientific deviations[.]" R.p. 237. He argues that by applying this margin of error to each element, the overall test procedure, the control group data and the particular testing by Roche, there is a composite margin of error of 15%, which exceeds accepted standards and casts the 99.9% index into considerable doubt. There is no evidence whatsoever that the margin of error increases when all phases of the test are properly administered. This argument lacks merit.
Given all the evidence, we cannot adopt Nash's view that the state's expert evidence was deceptively presented and interpreted. The trial court did not abuse its discretion in admitting and considering Dr. Foster's test results. This assignment does not present reversible error.

Assignment No. 3
By his final assignment Nash contends the trial court erred in finding that the state proved paternity by a preponderance of evidence. Nash asks us to reconsider the trial court's conclusion, with attention to his argument that the test results were faulty and the lay testimony did not prove intercourse in the correct time frame. He also argues that the evidence should be regulated by LSA-R.S. 9:397.3 D which, prior to amendment, provided:
§ 397.3. Admissibility and effect of test results
* * * * * *
D. If the court finds that the conclusions of all the experts as disclosed by the reports, based on the tests, are that the alleged father is not the father of the child, the question of paternity shall be resolved accordingly. If the experts disagree in their findings or conclusions, the question shall be submitted upon all the evidence. The tests and the testimony of the mother alone shall not be sufficient grounds for determining that the man is the father of the child. (emphasis supplied; emphasized portion deleted by LSA-Acts 1988, No. 298, effective September 9, 1988)
We have already reviewed the trial court's approach to the conflicting lay testimony; we found no basis for disturbing the court's credibility call. We have also reviewed the court's decision to admit and assign weight to the blood test results; we found no abuse of discretion. The determination of whether there has been sufficient proof of descent from an alleged parent is a question of fact. Williams v. Williams, supra. The trial court's findings of fact and credibility should not be disturbed in the absence of manifest error. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
*876 Nash reiterates his unwavering denial of paternity and his refusal to have any relationship with the child; he apparently feels that evidence of this sort is necessary to get around the "tests and testimony of the mother alone" provision cited above. In most of the reported cases, the alleged father made at least a slight acknowledgment; this is totally absent from the instant case. However, Nash admitted having a sexual relationship, albeit brief, with Ms. Braden. This sufficiently distinguishes the case from one like O'Bannon v. Azar, supra, in which the putative father's denials went uncontradicted except for the mother's self-serving statements.
Furthermore, the trial court recognized Nash's position but felt that the state's other evidence, from witnesses like Phyllis Fisher and Maurenne Mullins, was adequate to corroborate Ms. Braden's rendition of what happened. We have repeatedly held that this kind of testimony, when based on a reasonable credibility call, is corroborative. State v. Bolden, 519 So.2d 362 (La.App. 2d Cir.1988); State, etc. v. Rice, 482 So.2d 873 (La.App. 2d Cir.1986). We will not disturb the trial court's finding. This assignment does not present reversible error.

Conclusion
For the reasons expressed, the judgment is affirmed at the cost of the appellant, Robert E. Nash Jr.
AFFIRMED.