561 So.2d 871 (1990)
Tonyia WILLIAMS, Appellee,
v.
Reggie OLDEN, Appellant.
No. 21422-CA.
Court of Appeal of Louisiana, Second Circuit.
May 9, 1990.
*872 Barnes, Jefferson & Robertson by Stephen A. Jefferson, Monroe, for appellant.
Marshall Blackwell, Monroe, for appellee.
Before MARVIN, FRED W. JONES, Jr. and NORRIS, JJ.
NORRIS, Judge.
The defendant, Reggie Olden, appeals a judgment declaring him the biological father of a child born to plaintiff, Tonyia Williams. Olden contends the trial court erred in 1) finding that Williams proved by a preponderance of the evidence that he is the father of the child; 2) holding that the blood test expert's testimony was that there was a 90% probability that he is the father; and 3) in admitting into evidence the blood test report and expert opinion when the blood test expert allegedly could not explain her conclusion, there was no verified chain of custody of the blood samples, as required by LSA-R.S. 9:397.2, the report was not certified by affidavit or filed and Olden was not notified, all as required by LSA-R.S. 9:397.3. For the reasons which follow, we affirm.

FACTS
The child, Laura Lindsey Williams, was born December 28, 1987. Dr. Joseph Wayne Smith, an obstetrician who delivered Williams's child, calculated the date of conception as occurring between March 28 and April 4, 1987.
Olden and Williams began dating in December 1984. They lived together from January 1985 to May 1986 and continued to date until December 1986. Both parties testified that they had frequent sexual relations throughout this time. According to Olden, however, they ceased having sexual relations from December 1986 until May 1987, which was after the period of conception.
Both parties testified that they did not see each other in January 1987. Olden admitted he saw Williams twice in February 1987. He said that they went to Natchez in the middle of February and to Shreveport at the end of February. He stated that both times they stayed overnight in a hotel room together, but denied sexual intercourse on either occasion. He denied seeing her in March or April 1987. According to Olden, he and Williams started dating again at the end of May 1987 and continued to date until the end of June 1987. He admits having sexual relations with Williams during this time. He testified that in June 1987 Williams told him that she was pregnant with his child and that the child was conceived in May 1987; he suggested that she have an abortion.
Williams testified that after they had broken up in December 1986, she next heard from him in late February 1987, when he called and asked her to marry him. She stated that she saw Olden almost daily in March and resumed frequent sexual relations. She testified that they went to Natchez on March 13, 1987 and to Shreveport at the end of March. She stated that they went to Shreveport with Doug Turner and Debbie Primos. She testified that they stayed together in a motel room on each occasion and while they did not have sexual intercourse in Natchez, they did on the Shreveport trip. According to Williams, when they returned from Shreveport, they continued to date and engage in sex until sometime in April 1987. After a brief separation, she testified that they got back together in late May 1987. By mid-June, she suspected that she was pregnant and took a pregnancy test which revealed her pregnancy. After informing Olden of her condition, they went on a planned trip to Las Vegas, where they again engaged in sexual intercourse. Olden wanted her to have an abortion and, after she refused, he ended the relationship. She testified that during the time she dated Olden, especially March *873 and April 1987, she was never intimate with anybody else.
Williams moved in with a friend, Carrie Gladney, on March 1, 1987 and roomed with her until October 1987. Gladney testified that she saw Olden at their apartment with Williams "a couple of times." She was not sure, however, of specific dates, but believed it was in the earlier part of the year. Gladney testified that Williams and Olden went to Natchez and Shreveport together in March 1987. She also testified that Williams was not seeing other men during March 1987.
Beverly Freeman, Williams's sister, moved out of the apartment with Gladney and moved into a townhouse in Bastrop on March 1, 1987; she testified that once Williams and Olden came over for dinner in March or April.
Debbie Primos testified that she went to Shreveport with Williams and Olden in late February 1987; she stated that she did not go with them in March 1987. She brought a credit card statement showing a charge at a Shreveport motel on "2/29/87." Since there was no February 29, 1987 (it was not leap year), Primos reasoned that the receipt had a typographical error and should have read "2/27/87." Primos admitted that she was a good friend of Olden's and Olden had dated her sister.
Linda Armstrong, a blood testing expert from the North Louisiana Crime Lab, conducted the paternity test from blood samples submitted by the parties and the child. She testified at trial and her written report was also admitted into evidence in connection with her testimony. Armstrong testified that the testing showed that Olden was 9.1 times more likely to be the father than the randomly selected average white male and his relative probability of paternity is 90%. She also testified that 25.6% of the white male population could possibly be the father of Williams's child and Olden is one of the 25.6%. Armstrong testified that Olden's relative probability of paternity was 90%, explaining this as a 90% probability that Olden "could not be excluded" as the possible father of the child.
The trial court found that Williams proved that Olden was the father by a preponderance of the evidence and fixed child support at $185 per month, retroactive to March 1, 1988. The court stated that Williams appeared to give credible testimony, with the fact of her regular contact with Olden in March and April 1987 being corroborated by her former roommate, Carrie Gladney, and her sister, Beverly Freeman. The court considered the testimony of Olden and Debbie Primos and noted specifically that its ruling was based upon the totality of the evidence.

ASSIGNMENT OF ERROR # 1
By this assignment of error, Olden argues that the trial court erred in finding that Williams proved paternity by a preponderance of the evidence.
The burden of proving paternity is by a preponderance of the evidence. LSA-C.C. art. 209; State v. Sharplin, 431 So.2d 864 (La.App. 2d Cir.1983); State Through Dept. of Health v. Smith, 459 So.2d 146 (La.App. 2d Cir.1984). The determination of whether there has been sufficient proof of paternity is a question of fact and should not be disturbed on appeal unless it was manifestly erroneous. State in Interest of Braden v. Nash, 550 So.2d 866 (La. App. 2d Cir.1989); Patterson v. Johnson, 509 So.2d 35 (La.App. 1st Cir.1987).
The parties substantially agree as to the history of their sexual relations from January 1985 through June 1987 except for Olden's denial of intercourse in March and April 1987, the possible period of conception. Williams testified that she had sexual intercourse with Olden and with no one else during this particular period. Gladney and Freeman corroborated that she was seeing Olden during this time, and they saw her with nobody else. The trial court concluded that Williams's testimony was credible. The blood test results were certainly not inconsistent with Williams's testimony that Olden was the father. In light of the trial court's great discretion in evaluating the credibility of witnesses and determining factual issues, we cannot say it manifestly erred in concluding that Olden *874 is the father of Williams's child. Rosell v. Esco, 549 So.2d 840 (La.1989). This assignment does not present reversible error.

ASSIGNMENT OF ERROR # 2
By this assignment, Olden contends the trial court erred in holding that the testimony of Armstrong was to the effect that his probability of paternity was 90%. According to Olden, Armstrong actually testified that he has a 90% chance of not being excluded from paternity, along with 25.6% of the white male population. She also testified that she "cannot say that he is the father of the child." R.p. 154.
The findings advanced by Mrs. Armstrong at trial are as follows: The test results do not prove that Olden is the father of the child, but he also cannot be excluded as the father; the blood grouping tests yield a "paternity index" of 9.1, meaning that Olden is 9.1 times more likely to be the father than a randomly selected white male; the "relative probability of paternity" is 90%; and the blood group factors that were passed to the child are present in 25.6% of the white male population. Apparently, "relative probability of paternity" is a term of scientific art. On more than one occasion on cross-examination, she explained this term of art as the probability "that he [Olden] cannot be excluded" as the father of Williams's child. In other words, the relative probability is 90% that Olden cannot be excluded as the father of the child. Obviously, the trial judge applied the term in the sense that she explained. If, as Olden seems to argue, the trial judge had found it 90% certain that he was the father, then this would have amounted to an evidentiary preponderance and there would be no need to consider the lay testimony. The trial judge specifically stated in reasons for judgment that this was not the case; he considered all of the evidence and weighed the credibility of the witnesses. In his reasons for judgment, he noted that he did not base his decision on the results of a single test. We would note that a paternity index of 9.1 is only slight evidence that Olden is actually the father. Johnson v. Gant, 516 So.2d 1275 (La.App. 2d Cir.1987). The trial judge considered Armstrong's testimony in light of the other evidence and plainly did not assign it undue weight. The trial court did not err in its assessment of Armstrong's testimony. Accordingly, this assignment lacks merit.

ASSIGNMENT OF ERROR # 3
By this assignment, Olden argues the trial court erred in admitting into evidence the opinion of the blood test expert and her corresponding report when she allegedly could not explain how she reached her conclusions and her testimony was full of internal contradictions. Also, according to Olden, the written test results were inadmissible because they failed to comply with the Uniform Act on Blood Tests to Determine Paternity, LSA-R.S. 9:396 et seq., especially §§ 397.2 and 397.3.
Olden's attorney stipulated to Armstrong's expertise but objected to her opinion as to the test results on the basis that she could explain neither her test procedure nor the analysis by which she reached her conclusions. Olden's attorney also objected to the admissibility of the written report on the grounds that it did not conform to the expert's testimony. We believe that the blood test expert sufficiently explained how she performed her analysis and calculated her conclusions. Ms. Armstrong testified that she analyzed the blood group systems for Olden, Williams, and the child. She then compared the results of each blood group system and derived a paternity index, which was calculated from data accumulated from research. The testimony of Armstrong was admittedly of a technical nature and difficult to understand. However, the trial court found that a proper foundation was established and that Armstrong was entitled to testify as to the test results. The trial court held that the objection to the admissibility of the written report on the grounds that it did not conform to Armstrong's testimony went to the weight, rather than the admissibility, of the evidence. The trial court is accorded considerable discretion in the acceptance or rejection of expert evidence. Copple v. Gonyea, 431 So.2d 869 (La.App. 2d Cir.1983); Friday's Plumbing *875 and Heating Co. v. Byers, 415 So.2d 256 (La.App. 2d Cir.1982). We find no abuse of the trial court's discretion in this case.
A thorough review of the record shows that Olden's attorney never raised the objection of noncompliance with the Act at trial. The failure to object on this basis constitutes a waiver of the right to complain on appeal. See Chalik v. Gerace, 459 So.2d 82 (La.App. 2d Cir.1984); Moity v. Guillory, 430 So.2d 1243 (La.App. 1st Cir. 1983), writ denied 437 So.2d 1148 (La.1983); LeBlanc v. LeBlanc, 472 So.2d 312 (La. App. 3d Cir.1985). Furthermore, it is obvious from the record that defense counsel was made aware that Armstrong would testify and her report would be submitted into evidence. On September 15, 1988, defense counsel received a letter from Armstrong which gave the test results. On February 13, 1989, he executed a pre-trial statement acknowledging that Armstrong would testify at trial and the blood test results would be one of Williams's exhibits. The trial was held on April 7, 1989. He voiced no objection in the pre-trial statement or at trial on the basis of noncompliance with R.S. 9:396, et seq. Therefore, we conclude that Olden waived his right to contest the admissibility of the blood test report on these procedural grounds. Accordingly, this assignment does not present reversible error. The judgment is affirmed at defendant's costs.
AFFIRMED.