624 So.2d 472 (1993)
Wanda LITTON, Plaintiff-Appellant,
v.
Danny LITTON, Defendant-Appellee.
No. 25119-JA.
Court of Appeal of Louisiana, Second Circuit.
September 22, 1993.
*473 Richard Ieyoub, Atty. Gen., Baton Rouge, Paul Carmouche, Dist. Atty., Anne G. Marston, Asst. Dist. Atty., Shreveport, for plaintiff-appellant.
Stephen A. Glassell, Shreveport, for defendant-appellee.
Before NORRIS, HIGHTOWER and WILLIAMS, JJ.
HIGHTOWER, Judge.
Seeking child support pursuant to the Uniform Reciprocal Enforcement of Support Act, LSA-R.S. 13:1641, et seq., the State of Louisiana brought suit on behalf of Wanda Litton, and her minor son, Jason Litton, both presently residents of Arkansas. The trial court found that plaintiff did not prove defendant, Danny Litton, Sr. ("Danny"), to be the natural father. We reverse and remand.

BACKGROUND
Seven and one-half months after their January 1976 marriage, Wanda and Danny Litton became the parents of a child, Danny Litton, Jr. ("Junior"). In May 1978, Wanda secured a legal separation, but the couple reconciled a few days later. Even so, she soon moved from their Shreveport home to Marshall, Texas, where she began residing with her mother. In July 1978, Danny filed another separation action which culminated in a judgment dated December 21, 1978, after the rejection of a second claim of reconciliation. A subsequent divorce, on grounds of living apart, awarded the father custody of the child.
Approximately a year after the February 15, 1980 divorce, Wanda returned to Shreveport and began working as a bartender at the Pin Stripe Lounge, owned by her ex-husband's brother, Terry. She later testified that, when home from his offshore work, Danny would come to the establishment almost every night. She also asserted that, during the summer of 1981, the former spouses frequently engaged in sexual relations. Such encounters, estimated by her to be more than twelve, transpired at her apartment and sometimes at the home of Danny's parents during absences of his second wife, Linda. While living in Shreveport, according to her testimony, she neither dated nor had sexual intercourse with any other man. Earlier, in 1979 or 1980, she and Danny also *474 slept together when he visited her Texas residence.
Sometime in September 1981, a doctor at the LSU Medical Center in Shreveport informed Wanda that she had been pregnant "about three weeks." Soon thereafter, when she told Danny, he neither acknowledged nor denied paternity. She later moved to Arkansas after continuing to work at the lounge, according to her, until about six and one-half months of the full term pregnancy had elapsed. Jason was born on May 3, 1982.
Danny saw the child only twice during Wanda's visits with Junior at the home of defendant's parents. Nevertheless, she testified that the alleged grandparents, the Littons, referred to Jason as their grandson, and allowed him to call them "Mamaw" and "Papaw."
In evaluating Wanda's assertions, the state analyzed the blood of the mother, the child, and defendant, as authorized by LSA-R.S. 9:396, et seq. The test results established a 99.93 percent probability of paternity and a paternity index of 1359 to 1, all reflecting a likelihood of paternity that is "practically proved" as reported by National Paternity Laboratories.
At the September 1991 trial, the state also presented Robert W. Gutendorf, an expert in blood grouping, blood typing, paternity evaluation, and tissue analysis. He asserted that the paternity index showed "Mr. Litton [to be] 1,359 times more likely to be the biological father [of Jason] than another man of the same race who would also have the genetic capability of being the father." He further stated that the disclosed probability of paternity makes it "99.93 percent certain that Danny Litton is the biological father of Jason Litton."
Defendant conversely denied all allegations of paternity, could not remember Wanda's pregnancy, and claimed he first became aware of Jason's existence about a year after his birth. He admitted occasional contact and discussions with his former spouse at the lounge, but disavowed any sexual relations. Under cross-examination, he recalled breaking up a fight at the Pin Stripe between Wanda and Linda, his second wife, but could not recollect why the altercation occurred. By the fall of 1981, he and Linda separated before divorcing. Danny further acknowledged that he lived with Linda before their marriage, which occurred on a date he could not bring to mind.
Defendant also presented four family members. His parents, with whom he lived during the summer of 1981, could not remember the resumption of a relationship between the former spouses. Nor could either of the older Littons call to mind any absences by defendant at night, or his wife, Linda, making any complaints. His mother did not recall whether she noted her ex-daughter-in-law's pregnancy; however, both of his parents conceded that, after the birth, Wanda said the baby was Danny's. Although these two witnesses visited with Jason four or five times, they could not remember whether the child referred to them as his grandparents.
Terry Litton believed that Wanda worked at the lounge for only six to eight weeks. He said she did not appear pregnant when she left her employment there. Also, he denied any knowledge of a romantic relationship between her and Danny, although they both had been regular customers and "kinfolk."
Junior, age 15 at the time of trial, remembered overhearing his mother tell Jason that his father was her second husband. On cross-examination, however, this witness also recalled another conversation in which Wanda identified defendant as the father.
After trial, the district court concluded the state had not shown by a preponderance of the evidence that defendant fathered the child. This appeal, by plaintiff, ensued from that determination.

DISCUSSION

I.
When the alleged parent of an illegitimate is alive, the burden of proving paternity is by a preponderance of the evidence. LSA-C.C. Art. 209(A); State v. Givens, 616 So.2d 259 (La.App.2d Cir.1993); State in Interest of Lawrence v. Harrell, 582 So.2d 940 (La.App.2d Cir.1991); State v. Stringer, 567 So.2d 758 (La.App.2d Cir.1990). Simply stated, it must be shown that paternity by the *475 defendant is more probable than not. Hines v. Williams, 567 So.2d 1139 (La.App.2d Cir. 1990), writ denied, 571 So.2d 653 (La.1990). Proof of paternity is a factual question, and a trial court's determination of the issue should not be disturbed, absent manifest error. State v. Givens, supra; State in Interest of Ezell v. Evans, 600 So.2d 90 (La.App.2d Cir. 1992); State v. Stringer, supra. Though alone insufficient to prove paternity, scientific testing provides persuasive and objective evidence that can well help establish proof by a preponderance. LeBlanc v. LeBlanc, 497 So.2d 1361 (La.1986); State v. Givens, supra; State in Interest of Ezell, supra; State v. Stringer, supra.
The purpose of blood analysis is either to exclude the alleged father from the possibility of paternity, or, if not excluded, to calculate the odds that the defendant would have passed the disclosed genetic markers to a particular child. State v. Givens, supra; State v. Stringer, supra. In the case sub judice, despite adamant objection by defense counsel, the trial court determined that the expert testimony fully established the accuracy of the test results. As stated, the scientific evidence showed a paternity index of 1359 to 1, and a 99.93 percent probability of paternity. We further note that a paternity index of 1359 to 1 is "very strong evidence" that the named defendant is actually the father. Cf. State v. Givens, supra. See also, e.g., State v. Bolden, 519 So.2d 362 (La. App.2d Cir.1988), where the blood test report classified even a 99.71 percent probability as showing paternity "extremely likely."
In addition to strong scientific evidence of paternity, the trial judge recognized a physical resemblance between defendant and the child. Beyond that, the record reflects several other relevant considerations:
(1) Not only had Wanda and Danny previously been married for more than four years, but a physical attraction between them continued even after they began living apart and instituted legal proceedings.
(2) The conception of the parties' first child apparently occurred out of wedlock.
(3) Danny engaged in sexual relationships before marriage with both wives, reflecting a propensity for promiscuity on his part.
(4) Danny frequented the lounge where Wanda worked, and also acknowledged ongoing contact and discussions with her.
(5) An altercation of some form eventually intervened between Wanda and Linda.
(6) Danny's parents apparently developed no animosity toward Wanda, even after she identified their son as Jason's father.
Obviously, each of these factors must be weighed with the other evidence in determining whether plaintiff sustained its burden of proof.
Anent the alleged father's case, the Litton family members generally did not "recall," "remember" or "have knowledge" of Danny's relationship with Wanda, or other detailed aspects of defendant's life. Curiously, however, they could providein some instances quite without solicitationspecific names of males supposedly associated with Wanda in Shreveport, and even previously. (For example, Terry Litton volunteered that Michael Gray, one of the best patrons of the lounge, shot pool and drank beer with Wanda on several occasions). Understandably, the trial judge charged such lack of memory to the ten-year interval between the disputed events and trial. Even so, upon careful examination, the subject testimony is in the nature of negative evidence. That is to say, it relates only to the witnesses' lack of personal knowledge concerning sexual encounters by the parties. See Bailey v. Douglas, 478 So.2d 172 (La.App. 3d Cir.1985), writ denied, 479 So.2d 365 (La.1985). Of course, there exists an obvious weakness in declaring the intimacies of others. Indeed, as observed by defendant's father, "That's something you never know for sure."
Notably, here, we are not confronted with an alleged one-night encounter between virtual strangers, nor test results unexplained by expert testimony, as respectively portrayed in Perkins v. Vega, 554 So.2d 787 (La.App. 5th Cir.1989), writ denied, 559 So.2d 139 (La.1990), and State v. Montgomery, 574 So.2d 1297 (La.App. 3d Cir.1991), writ denied, 577 So.2d 38 (La.1991), both highly embraced by defendant. Instead, the present record contains strong, well-explained scientific data, in addition to reflecting an *476 earlier relationship and ongoing contact between the averred parents.
As stated, the unrebutted testimony of the state's expert establishes a 99.93 percent probability of paternity. Standing alone, this is strong evidence. Moreover, and most importantly, when such substantiation is combined with the trial judge's recognition of a physical resemblance, and weighed with the other enumerated factors previously discussed, in addition to the limited recall of defendant's witnesses, we find the lower court clearly wrong in rejecting plaintiff's demands in reference to paternity.

II.
In his brief, defendant argues that the trial court erred in admitting the blood analysis without requiring testimony from the lab technicians. To explain the results and testing procedures, the state presented the scientist who prepared the report, and also set forth his extensive qualifications. A testifying expert need not be the individual who actually drew the blood, performed the test, or compiled the statistics; instead, he may rely on data compiled by other technologists. LSA-C.E. Art. 703; State v. Stringer, supra; State in Interest of Braden v. Nash, 550 So.2d 866 (La.App.2d Cir.1989).
Based on Gutendorf's testimony, the trial judge expressed satisfaction that two technologists independently performed the tests and appropriately reviewed any discrepancies. Where the paternity expert testifies that an accurate protocol is followed, the trial court should admit the report. Cf. State in Interest of Braden, supra, finding the performance of each test twice to be adequate. Moreover, LSA-R.S. 9:397.3(B) specifically authorizes the summoning of technical personnel for cross-examination. Thus, on his own initiative, appellee plainly could have assured the presence of the additional specialists. Certainly, as disclosed by the record, no abuse of discretion transpired through the admission of the test results.

CONCLUSION
Reviewing the record in its entirety, we conclude that the trial judge manifestly erred in determining the state failed to establish paternity by a preponderance of the evidence. Accordingly, the previously rendered judgment is reversed, and it is hereby adjudged that defendant, Danny Litton, Sr., be recognized as the natural father of Jason Litton. Since the district court elected to adjudicate the paternity issue first in accordance with LSA-R.S. 13:1681, we remand the case for further appropriate proceedings. All costs are assessed to defendant.
REVERSED AND REMANDED.