660 So.2d 163 (1995)
STATE of Louisiana, DEPARTMENT OF SOCIAL SERVICES, Plaintiff-Appellant,
v.
William THOMAS, Defendant-Appellee.
No. 27248-CA.
Court of Appeal of Louisiana, Second Circuit.
August 23, 1995.
*164 Richard Ieyoub, State Attorney General, Baton Rouge, Don Burkett, District Attorney, Edward Chevallier, Assistant District Attorney, Mansfield, for appellant.
Elvin Fontenot, Jr., Leesville, for appellee.
Before HIGHTOWER, BROWN and STEWART, JJ.
HIGHTOWER, Judge.
In this paternity action, the State of Louisiana appeals a finding that it failed to prove defendant, William Thomas, to be the natural father of a fifteen-year-old girl. We reverse and remand.

BACKGROUND
On May 27, 1978, Geraldine T. Singleton gave birth to a daughter, Adrienne L. Taylor. Over fifteen years later, seeking to establish both filiation and an obligation to support the minor child under LSA-R.S. 46:236, et seq., the state filed a petition alleging William R. Thomas to be the biological father. Defendant's answer denied the claim, but subsequent DNA testing revealed his probability of paternity at 99.994% and calculated the paternity index at 16,500 to 1.[1]
Predictably, the child's mother and alleged father offered conflicting testimony regarding their relationship. Not oddly too, Singleton's two sisters testified for the state, while Thomas's father took the witness stand on his son's behalf. In oral reasons rendered immediately at the conclusion of the trial, the *165 district judge acknowledged the strong scientific evidence and that "the sisters' very truthful testimony" placed the mother and defendant together on occasions. Even so, relying on his own out-of-court familiarity with the parties and their families, the judge reasoned:
It goes beyond logic to imagine for sixteen (16) years until this date, or at least until this proceeding was begun, that a grandchild, a niece, a nephew, would be denied that status if it in fact was true.
Consequently, in his view, he had "no recourse" other than to find that the state failed to carry its burden of proof. After formal dismissal of all demands, this appeal ensued.

DISCUSSION
When the alleged parent is alive, the burden of proving paternity is by a preponderance of the evidence. LSA-C.C. Art. 209(A); State v. Givens, 616 So.2d 259 (La. App. 2d Cir.1993); State in Interest of Lawrence v. Harrell, 582 So.2d 940 (La.App. 2d Cir.1991); State v. Stringer, 567 So.2d 758 (La.App. 2d Cir.1990). Simply stated, it must be shown that paternity by the defendant is more probable than not. Litton v. Litton, 624 So.2d 472 (La.App. 2d Cir.1993), writ denied, 93-2657 (La. 01/07/94), 631 So.2d 456. Proof of paternity is a factual question, and a trial court's determination of the issue should not be disturbed, absent manifest error. State v. Givens, supra; State, in Interest of Ezell v. Evans, 600 So.2d 90 (La.App. 2d Cir.1992); State v. Stringer, supra. Although alone insufficient to prove paternity, scientific testing provides persuasive and objective evidence that can well help establish proof by a preponderance. LeBlanc v. LeBlanc, 497 So.2d 1361 (La.1986); Litton, supra; State v. Givens, supra; State, in Interest of Ezell, supra; State v. Stringer, supra.
The purpose of blood analysis is either to exclude an accused male from the possibility of paternity, or, if not excluded, to calculate the odds that he would have passed the disclosed genetic markers to a particular child. Litton, supra; State v. Givens, supra; State v. Stringer, supra. In the present case, the paternity index and probability of paternity are extremely high.[2] Cf. Litton, supra (viewing a paternity index of 1,359 to 1 as very strong evidence). Nevertheless, cognizant that such scientific results must be supported by other competent evidence linking the mother and the alleged father, we turn to the trial testimony.
Singleton testified that she and Thomas had sexual intercourse at the time of conception, and that they had been dating for several years before then. Furthermore, she unequivocally stated that she did not go out, or have sex, with any other men during the period in question. For a good while, the families of the pair had been closely associated through their church. In fact, Singleton's cousin dated and eventually married Thomas's sister. Besides that, all four of these young adults had been friends while attending college together in Texas.
Frequently on weekends, Thomas would come from his home in Leesville to visit Singleton, who lived in Mansfield. He would either drive his own car or travel with his father, the minister of a nearby church. The mother's testimony indicated that she and Thomas generally engaged in sexual relations three to four times per month, but due to "a few problems" such activities temporarily ceased for a month or two before the crucial liaison. Generally, the lovemaking transpired when the couple went somewhere alone in an automobile. Singleton additionally testified that she discussed her pregnancy with Thomas upon traveling to Leesville by bus around March of 1978, and that he later admitted paternity to her family and his sister. When asked why she waited so long to make a claim, the mother responded that her sister had been helping her with finances. She further stated that, despite having named defendant as the father several years *166 earlier when she received food stamps, the case "never did get off the ground."[3]
On the other hand, after first testifying he simply could not remember ever having sexual relations with Singleton during the indicated multi-year period, defendant soon categorically denied any such activity, or that he even dated the child's mother. Similarly, he disclaimed having acknowledged paternity. Although he knew Singleton, Thomas said their relationship had been "like family" and had resulted from the closeness of their families within the same church.
As part of his denials, Thomas said he did not remember going to Mansfield during the time of the child's conception, inasmuch as he had just started working then and had no transportation. Neither could he recall traveling there with his father for church services. After indicating that he learned of Singleton's pregnancy through "second-hand" information, he stated her paternity claim first came to his attention when he received a request to appear in May, in 1979 or 1980.[4] At that time, after denying the allegation, he "never heard anything else." Similarly, in another matter, he began paying support only after "going to court" concerning a child his former wife conceived shortly before their brief marriage.
Both of Singleton's sisters, Darlene Turner and Carolyn Rushing, testified that the mother and Thomas dated prior to the child's birth. Turner indicated that her younger sibling went to Leesville to see defendant almost every Friday evening, and that the alleged father would visit Mansfield "all the time." Also, according to Turner, their family had strict rules about the girls seeing more than one boyfriend at a time. She further related that, when Thomas attended family gatherings, he and her sister would go off alone upon announcing plans to go riding or for food.
Rushing testified that, on more than ten occasions, she and her boyfriend transported Singleton to and from Leesville for weekend visits. Defendant would always exit the house where they went, but she never saw his father there.
The Reverend George Thomas, defendant's father, appeared as the only witness for his son. Not only did he know the mother, but also her family frequently visited the various churches under his pastorship. Although his son lived with him in Leesville in 1977, the elder Thomas could neither recall Singleton coming there to visit nor the accused father going to see her. He did remember, however, defendant going with him to church in Mansfield on weekends. Moreover, the minister acknowledged that his son and Singleton "visited" when their families got together. So too, when twice asked whether anyone told him his son fathered the child, he responded, "No, not directly." Finally, he agreed it could be "very possible" that the young couple had sexual relations.
Our courts, of course, have recognized both the obvious weakness in declaring the intimacies of others and the general lack of personal knowledge associated with such evidence. See Litton, supra; Bailey v. Douglas, 478 So.2d 172 (La.App. 3d Cir. 1985), writ denied, 479 So.2d 365 (La.1985). Excluding the participants themselves, witnesses to sexual relationships will be rare. Equally true, in contested paternity matters, the mother and alleged father commonly give conflicting accounts about their encounters at the time of conception. Thus, while the jurisprudence recognizes the insufficiency of scientific testing alone, a trial court still must appreciate the importance such persuasive, objective evidence can have in establishing proof of paternity by a preponderance.
In the case sub judice, we conclude that the trial court manifestly erred in deciding that the state failed to establish paternity. The previously mentioned strong scientific evidence is abundantly buttressed by the testimony of the mother and her two sisters. Beyond his own self-serving statements, defendant *167 presented little in contravention. Even his father admitted the inherent weakness in his son's case. Although recognizing the significance of the high paternity index and acknowledging the credibility of the state's witnesses, the district judge improperly relied upon his own personal knowledge of the families, outside the record. Considered as a whole, the record before us exhibits "an extreme unlikelihood," State v. Smith, 605 So.2d 222, 225 (La.App. 2d Cir.1992), that Singleton falsely accused Thomas of being the father of her child. In short, the lower court's judgment is supported by neither the evidence nor the jurisprudence. Cf. Litton, supra; State v. Givens, supra; State, in the Interest of Ezell, supra; State, in the Interest of Lawrence, supra.

CONCLUSION
For the foregoing reasons, the judgment of the trial judge is reversed, and it is hereby decreed that defendant, William R. Thomas, be recognized as the natural father of Adrienne L. Taylor. The case is remanded to the district court for further proceedings. All costs are assessed to defendant.
REVERSED AND REMANDED.
NOTES
[1] The probability of paternity indicates that 99.994% of all North American black men are excluded from being the child's father, while Thomas is within the 0.006% who are not eliminated. The paternity index shows that defendant is 16,500 times more likely to be the parent than a randomly selected, unrelated male of the North American black population.
[2] As a matter of fact, the index in the present case is more than double the highest number we could find in the Louisiana jurisprudence. Cf. State in the Interest of Lawrence, supra (reversing a rejection of the state's claim where the index had been 6,318 to 1); State v. Smith, 605 So.2d 222 (La.App. 2d Cir.1992) (affirming a paternity finding with an index of 3,474 to 1).
[3] An employee from the state enforcement services office confirmed that their computer records contain a closed food stamp case for Singleton.
[4] State welfare authorities presumably sought defendant's appearance soon after Singleton submitted her application for food stamps and listed him as the father. Thomas, however, only generically referred to the requesting entity as "they."