697 So.2d 628 (1997)
STATE of Louisiana In the Interest of Shalarrea La'Sadie VINSON, Minor Child of Belinda Vinson (Leonard), Plaintiff-Appellant,
v.
Larry SMITH, Defendant-Appellee.
No. 29464-CA.
Court of Appeal of Louisiana, Second Circuit.
June 18, 1997.
Rehearing Denied August 14, 1997.
*629 Daye, Bowie & Beresko, P.L.C. by Alfred R. Beresko, Shreveport, for Plaintiff-Appellant.
Davis Law Office, LLC by S.P. Davis, Sr., Shreveport, for Defendant-Appellee.
Before HIGHTOWER, BROWN and PEATROSS, JJ.
PEATROSS, Judge.
In this action to determine paternity and establish child support, the plaintiff, the State of Louisiana, Department of Social Services, in the Interest of Shalarrea Vinson ("State"), appeals the trial court's judgment finding that the State failed to carry its burden of proving Larry Smith ("Defendant") is the natural father of the minor, Shalarrea Vinson ("Child"). For the following reasons, we affirm the judgment of the trial court.

FACTS
On March 1, 1991, Belinda Vinson Leonard ("Mother") gave birth to the Child who is the subject of this paternity suit. The State filed a Petition to Determine and/or Declare Paternity and to Establish Child Support on April 24, 1992, alleging Defendant to be the natural father of the Child. Defendant filed an answer to the petition on May 13, 1992, in which he denied paternity and named Ronnie Boyd ("Boyd") and Clifford Leonard ("Leonard") as possible fathers of the Child. On June 18, 1992, the State and Defendant filed a Joint Motion and Order for Paternity Blood Testing which asserted that Defendant waived his right to a contradictory hearing on the issue of a paternity blood test on the condition that Boyd and Leonard also submit to paternity blood testing. The order did not mention Boyd or Leonard, who were not parties to the suit, but ordered only Defendant to submit to paternity blood testing.
Defendant and Leonard submitted to paternity blood testing on June 19, 1992. Boyd, who initially refused to submit to a test, was finally tested almost three years later. Leonard's test results, filed into the record on November 24, 1992, concluded *630 there was zero possibility that he was the father. Defendant's test results, filed into the record on July 29, 1992, determined that, to a 99 percent probability, he was the father. Boyd's results, filed on May 16, 1995, showed a zero probability that he was the father.
This matter went to trial on January 11, 1996. On January 18, 1996, after a bench trial, the trial court rendered judgment for the Defendant. On February 20, 1996, the trial judge signed a written judgment dismissing the State's claim against the Defendant, with prejudice, and assessing costs to the State. It is from this judgment that the State appeals and assigns as error the following: (1) the failure to admit into evidence Leonard's blood test results; (2) the failure to assign significant weight to Boyd's blood test results; (3) the admittance of hearsay testimony by Sheila Jackson and Alice Turner; (4) the alleged denial of cross-examination of the Defendant by the State; and (5) the finding that the State failed to establish paternity by a preponderance of the evidence.

DISCUSSION

Blood test results of Boyd and Leonard
In its first assignment of error, the State contends that the trial court improperly refused to admit into evidence Leonard's blood test results which excluded him as the father. In its second assignment of error, the State contends that the trial court failed to give significant weight to Boyd's test results which concluded he is not the father. Boyd's test results were admitted into evidence without any objection from the Defendant. When the State attempted to introduce Leonard's test results, Defendant's counsel objected. The trial court concluded that Leonard's test results would not be admitted into evidence because: (a) Leonard was not a party to the suit; (b) Leonard was never ordered to submit to blood tests; (c) no expert was ever appointed by the court to administer the test; and (d) no notice of the test results was sent to the Defendant in accordance with LSA-R.S. 9:397.3. The State made a proffer of Leonard's test results.
The purpose of the blood analysis is to exclude falsely accused men from paternity. State v. Givens, 616 So.2d 259 (La.App. 2d Cir.1993). The legal effect to be given an exclusion of paternity through scientific blood tests is provided for in LSA-R.S. 9:397.3(D), which states:
If the court finds that the conclusions of all the experts as disclosed by the reports, based upon the tests, are that the alleged father is not the father of the child, the question of paternity shall be resolved accordingly. If the experts disagree in their findings or conclusions, the question shall be submitted upon all the evidence.
We conclude that, even if the trial court's treatment of the Boyd and Leonard test results was improper, it is not reversible error because the test results have no effect on the outcome of this case. The zero probability results of their tests do nothing more than exclude Boyd and Leonard as the father of the Child. Their test results do not prove or disprove that the Defendant is the father of the Child.
This assignment of error lacks merit.

Proving paternity
In its fifth assignment of error, the State argues that the trial court erred in its determination that the State failed to establish paternity by a preponderance of the evidence. Dr. Alfred Stone, the Mother's obstetrician, estimated that conception occurred between June 7 and 27, 1990. The State relies heavily on the blood test results. The State also relies on the Mother's testimony that she only had sex with Boyd on July 1, 1990, and that she did not have sexual relations with Leonard during the conception period. Finally, the State relies on the Mother's testimony that her sexual relationship with the Defendant did not end until October 1990.
In addition, the State argues that the Defendant offered no corroborating evidence to prove that the relationship ended in April/ May 1990 as he claimed. The State further contends that Defendant's testimony that he did not visit the Mother's home after ending the relationship conflicts with the testimony of Johnnie Stokes, Yolanda Allen and Byron *631 Pennywell, who saw the Defendant at the Mother's home after May 1990. The State claims that, considering the totality of the evidence and facts, it has proven paternity by a preponderance of the evidence.
When the alleged parent is alive, the burden of proving paternity is by a preponderance of the evidence. La. C.C. art. 209(A); State, Dept. of Social Services v. Thomas, 27,248 (La.App.2d Cir. 8/23/95), 660 So.2d 163; State v. Givens, supra; State in Interest of Lawrence v. Harrell, 582 So.2d 940 (La.App. 2d Cir.1991). Simply stated, it must be shown that paternity by the Defendant is more probable than not. State v. Thomas, supra; Litton v. Litton, 624 So.2d 472 (La.App. 2d Cir.1993), writ denied, 93-2657 (La.1/7/94), 631 So.2d 456. Proof of paternity is a factual question, and a trial court's determination of the issue should not be disturbed, absent manifest error. State v. Thomas, supra; State, in Interest of Ezell v. Evans, 600 So.2d 90 (La.App. 2d Cir.1992). Although alone insufficient to prove paternity, scientific testing provides persuasive and objective evidence that can help establish proof by a preponderance. LeBlanc v. Le-Blanc, 497 So.2d 1361 (La.1986); State v. Thomas, supra; Litton, supra.
The admission of blood test results as prima facie proof of their content is allowed by LSA-R.S. 9:397.3(B). The statute does not state that blood test results are prima facie proof of paternity; and, as stated previously, blood tests results are not conclusive proof, but are persuasive evidence. State v. Montgomery, 574 So.2d 1297 (La.App. 3d Cir. 1991).
In the present case, the State introduced Defendant's blood test results which conclude that "The minimum Probability of Exclusion (PE; Excludes all other males except absent parent.) for these four genes is 99% and the minimum Paternity Index (PI; Likelihood that absent parent is the father assuming a prior probability of 0.5) is 100 to 1 relative to a man unrelated to either Belinda Vinson or Larry L. Smith."[1] No other evidence was introduced to explain the blood test and its conclusions. We agree with the trial judge's statement in his oral reasons for judgment that there are "a bunch of unanswered questions about this blood test report and what does it mean."
In State v. Montgomery, supra, the Third Circuit found that the unexplained scientific evidence[2] and the uncorroborated testimony of the Mother were not sufficient to prove paternity. The Defendant's blood test in the present case is also unexplained; and, thus, it does not conclusively prove that the Defendant is the father, but serves only to not exclude him as the father.
In addition, while the State would argue that, unlike State v. Montgomery, the Mother's testimony in the present case was corroborated, we note that the alleged corroborating evidence is so contradictory and full of inconsistencies that the trial judge was called upon to make credibility calls in his determination of the paternity issue. From the record presented and, in particular, the testimony discussed below, we must defer to the trial court's discretion in making such credibility calls.
The central issue in the factual determination of paternity in this case involved the timing of the termination of the relationship that existed between the Mother and the Defendant. As previously stated, Dr. Stone estimated that conception occurred between June 7 and 27, 1990; thus, the State had to *632 show that the Mother and the Defendant were having sexual intercourse during this time. While the parties admit that the relationship began sometime in 1987, they do not agree when it ended. The Mother testified that the relationship did not end until October 1990, and that she and the Defendant had sexual intercourse until that time. The Defendant, however, stated that he ended the relationship in either April or May 1990, and that he never went to the Mother's home or engaged in sexual intercourse with her after May 1990.
While the Mother did not know exactly when she became pregnant, she originally testified that she discovered she was pregnant on the second Sunday in June 1990. She claimed that when the Defendant was at her house she informed him she felt she was pregnant and that he subsequently purchased a pregnancy test for her. She administered the test the next morning and informed Defendant that night that she was pregnant. Subsequent to this testimony, the Mother remembered it was the second Sunday in July 1990, rather than June, that she discovered she was pregnant.[3] The Mother claimed that the Defendant told her it was not a good time to be having a baby and he asked her to have an abortion.
The Defendant testified that he never purchased a pregnancy test for the Mother. He also stated that he did not know about the Mother's pregnancy until July 1990, when she paged him on his beeper and he returned her call. The Mother told him she was pregnant, but she did not know who was the father. When he asked her if she thought the Child was his, she told him no. The Defendant also testified he told the Mother that if the Child was his, he would help pay for an abortion.
Much of the Mother's testimony is contradicted by witnesses called by the State to corroborate her allegation that the relationship did not end until October 1990. The Mother testified that Leonard was not at her house in 1990, but her neighbor, Johnny Stokes said that he saw Leonard at the Mother's home every month in 1990. In addition, the Mother claimed that she and Leonard did not resume their sexual relationship until January 1991, but Leonard testified that he and the Mother engaged in sexual intercourse in December 1990. The Mother also stated that John Alexander, a friend of the Defendant, came with the Defendant to her house in March or April 1990, yet Mr. Alexander stated that he never went to the Mother's home in March or April 1990.
The defense witnesses also contradicted the Mother's testimony. The Mother testified that she never telephoned Alice Turner, the lady with whom Leonard lived from 1987 until 1992. The Mother also stated that, while there is a possibility she visited Ms. Turner's home on other occasions, she specifically recalled only one visit in which she attempted to get Leonard to finish the work on her house. The Mother further testified she never told Ms. Turner that Leonard was the father of the Child. Ms. Turner testified that the Mother came to her house several times but never mentioned wanting Leonard to complete any work. She further testified that the Mother telephoned her a number of times and told her that Leonard was the father of the Child.
In addition, defense witness Sheila Leonard Jackson, the daughter of Leonard, testified that she knew the Mother and Leonard were having an affair prior to her own mother's death. Ms. Jackson stated that the Mother would page Leonard at night and in the morning and would call the house and say derogatory things, which Ms. Jackson overheard. Ms. Jackson also testified that she and the Mother had confrontations about her relationship with Leonard, primarily through telephone calls initiated by the Mother. This was all contrary to the Mother's testimony.
Even the witnesses on which the State relies to place the Defendant at the Mother's home subsequent to May 1990 are questionable. Johnny Stokes, the Mother's neighbor, testified that while he was uncertain of the exact date, the last time he saw the Defendant *633 at the Mother's home was in October/November 1990; he estimated it to be around the time that school started in the fall. He further testified that, in addition to Boyd and Leonard, he also saw numerous other men at the Mother's home during 1990. Mr. Stokes also admitted to the trial judge that in 1994 he was robbed at gunpoint and beaten on the head, and that since that incident he could not remember things well.
Byran Pennywell, the Mother's first cousin who lived with the Mother from September until October 1990, testified that he saw the Defendant at the Mother's home about three times a week. He stated that the Defendant would be at the house when he got home from school at about 9:30 p.m., and that the Defendant's car would sometimes still be there in the morning. The Defendant's uncontradicted testimony, however, was that he was working the second shift from 4:12 p.m. until 12:30 a.m. In addition, the Mother testified that the Defendant never spent the night at her house.
The Mother testified she told her first cousin, Yolanda Allen, that the Defendant was the father of the Child. Ms. Allen said, however, that the Mother never told her who was the father. While Ms. Allen did testify that she saw the Defendant at the Mother's home while she was living there from August 1989 until about July 4, 1990, most of the other testimony in this case appears to be contradictory and unreliable. The trial judge stated in his oral reasons for judgment, "... I have a great deal of concern about the testimony that I heard here in this case. There's a lot of conflict here in testimony. There's a lot of conflict between the witnesses.... But the judgment calls I'm making on these witnesses, you know, I heard their testimony. I watched them."
Where there is conflicting testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court is convinced that had it been the trier of fact, it would have weighed the evidence differently. Lirette v. State Farm Ins. Co., 563 So.2d 850 (La.1990); Choyce v. Sisters of Incarnate Word, 25,958 (La.App.2d Cir. 8/19/94), 642 So.2d 287. The trier of fact is in a better position to evaluate the credibility of witnesses and make factual determinations than a reviewing court. Stobart v. State Through DOTD, 617 So.2d 880 (La. 1993); Choyce, supra. Faced with the unexplained scientific evidence and all of the conflicting evidence in the present case, we cannot say that the trial court's credibility calls and factual determinations were clearly wrong. As such, the trial court properly determined that the State failed to meet its burden of proof.
This assignment of error lacks merit.

Hearsay Testimony
In its third assignment of error, the State alleges that the trial court admitted the alleged hearsay testimony of Sheila Jackson and Alice Turner, which related to statements made by the Mother and Leonard. The State's counsel objected during Ms. Turner's testimony and the trial court overruled the objection on the grounds that the testimony was offered for impeachment purposes. After the State's counsel continued to make hearsay objections, the trial court allowed him to make a continuing objection to hearsay and stated that if any testimony was hearsay, the court would disregard it. The State contends that the trial court's oral reasons for judgment show that the trial judge relied specifically on some of the hearsay testimony.
After reviewing the testimony, and in accordance with our discussion of the State's proof of paternity, we agree with the trial court that this testimony was not offered to prove the truth of the matter asserted in the statements, but was offered to impeach the Mother's testimony and, thus, was not hearsay.
This assignment of error lacks merit.

Right to cross-examine the Defendant
In its fourth assignment of error, the State complains that the trial court erred in denying its right to effectively cross-examine the Defendant after he testified on his own behalf during the defense case. During the State's case-in-chief, the Defendant was called on cross-examination. Before the questioning began, the trial judge discussed *634 with the parties how the method of questioning would occur.
The following discussion took place:
THE COURT: ... Now, to this rule on questioning that I just came up with, and I really love it because it stops the jockeying back and forth and really gets things kind of through the process. That rule is going to apply with regard to Mr. Smith as well.
So if you put Mr. Smith on the witness stand now, then you're free to do that, and you're calling him as an adverse witness in your case. I'm not going to let you beat up on Mr. Smith now and then beat up on him again when Mr. Davis puts him on the witness stand. Because you're going___you're going to double question him and I'm not going to do that.
So, now that I've clued you in on this, if you want him to step down, no problem. If you want to go ahead and take him now, no problem. Just be real clear if you do that, and Mr. Davis doesn't fool with him now
If he questions him now and then wants to put him on in his case again, then I'm going to let you cross-examine him again. But if he sits tight, I'm basically giving S.P. one shot at his guy, too. Because I don't want to hear it twice; okay.
MR. BERESKO: Okay.
THE COURT: We're all on the same wave length.
MR. DAVIS: Yes, sir.
THE COURT: So you still want Mr. Smith to stay up there?
MR. BERESKO: Yes, sir.
Defendant's counsel did not question the Defendant during the State's case. After the Defendant testified on his own behalf during the defense, the State was not allowed to question the Defendant.
A trial court is afforded much discretion in the manner in which proceedings before it are conducted, and such decisions will not be reversed in the absence of an abuse of discretion. La. C.C.P. art. 1631; Walker v. ConAgra Food Services, 28,205 (La.App.2d Cir. 4/3/96), 671 So.2d 1218. Although the trial court may have been in error in proscribing cross-examination of the Defendant following his direct testimony, counsel for the State failed to object. In addition, all parties agreed with the trial court's "rule" on questioning; and, when the trial court informed the State that it would not be allowed to question the Defendant again, counsel's response was, "That's fine, Your Honor."
This assignment of error lacks merit.

CONCLUSION
For the foregoing reasons, the judgment of the trial court is affirmed. The costs of this appeal are assessed to the State in accordance with applicable law.
AFFIRMED.
HIGHTOWER, J., dissents with written reasons.
HIGHTOWER, Judge, dissenting.
The rejection of this five-year-old's paternity claim calls out for reversal. Yet, despite a record strongly pointing to the defendant as the father, the majority ratifies a decision foreclosing all future demands against him, whether by the state, the mother, or the child.
Even with respect to the initial aspect of the opinion, I must disagree with my colleagues. The trial court's improper treatment of the Boyd and Leonard test results not only constituted error, but further provided the beginning steps toward the wrong decision ultimately reached below.
Boyd's results, admitted without objection, show a zero probability of paternity on his part and firmly exclude him from consideration as the father. La. R.S. 9:397.3(D). Likewise, the trial court erred in refusing to admit Leonard's test results that also unequivocally eliminate him from consideration as the biological father.
Defendant himself initially sought and moved to have Leonard tested and nominated as the father. Later, on October 13, 1995, in preparation for the approaching trial, the state filed a pretrial memorandum stating *635 that "[t]he parties have agreed that the blood test results for all parties will be admitted into evidence." The defendant did not protest. Also, in a letter dated October 26, 1995, plaintiff counsel wrote to his opponent:
Pursuant to our recent discussion, it was my understanding that you are not going to object to the admissibility of the blood tests taken by Larry Smith, Ronnie Boyd and Clifford Leonard and we can then stipulate to their admissibility.... If my understanding of the admissibility of the blood tests is incorrect, please advise immediately.
Again, the defendant did not respond in any way, even when filing his pretrial memorandum on November 9, 1995. Not until Smith launched his surprise attack at trial, in mid-January, did the state become aware of any objection to the admission of Leonard's blood test results.
To allow a party, after remaining silent as occurred here, to ambush an opponent in such a manner at trial is patently unfair. Even if no agreement existed, as found by the lower court with an apology to plaintiff's attorney, the defendant had been well informed that plaintiff was operating under that assumption. Under these circumstances, a party cannot simply elect to take no action while waiting until trial, almost three months later, to spring the issue.
In this case, Boyd's and Leonard's results established a zero possibility of paternity by either of these two individuals. And, notwithstanding the majority's contrary conclusion, that factor is certainly pertinent to the outcome of this matter. Obviously, by eliminating two of the three men directly in question, the field of potential fathers is dramatically narrowed.
Nor is the ascertainment of truth well served by affirming the judge-imposed rule limiting plaintiff's cross-examination of Smith. While the trial court certainly may exercise reasonable control over the mode and order of interrogating witnesses, La. C.E. art. 611(A), a party cannot be deprived of the opportunity to cross-examine as to all matters brought out on direct examination, La. C.E. art. 611(B, D). Here, in announcing a "rule of questioning that [the court] just came up with, and [that the court] really love[d]," the trial judge explained that the restriction basically prevented "double question[ing]," and was created "[b]ecause I don't want to hear it twice." Imposition of the limitation, however, resulted in plaintiff being totally denied the opportunity to cover even matters raised for the first time during defense counsel's questioning of Smith. In my view, this constituted an abuse of discretion, especially after Smith and the court had extensively cross-examined the mother and most of the state's other witnesses.[1]
The manifest error standard, true enough, leaves reasonable evaluations of credibility and reasonable inferences of fact to the discretion of the trial judge. When those determinations are clearly wrong, however, this court is called upon to reverse. La. Const. Art. 5 § 10; Alexander v. Pellerin Marble & Granite, 93-1698 (La.01/14/94), 630 So.2d 706. The instant case plainly falls into the latter category. Realistically considering testimony by a total of five witnesses placing Smith in the mother's home well past the date of conception, buttressed by the blood test results (including the 99 percent probability in reference to the defendant), Smith's long-term and intimate relationship with the mother, and his own admission that he offered to help pay for an abortion, the state adequately carried its burden of proof. Simply put, this record certainly establishes more probably than not that defendant is the father of this child. To conclude otherwise, as did the trial court, is clearly wrong.
Proper resolution of paternity issues is a far more important matter than one would discern from the trial judge's cavalier and coarse description of this litigation as a game of "pinning the tail on the donkey."
For these reasons, respectfully but emphatically, I dissent.

*636 APPLICATION FOR REHEARING
Before HIGHTOWER, BROWN, GASKINS and CARAWAY, JJ.
Rehearing denied.
NOTES
[1] We note that the 1995 amendment to LSA-R.S. 9:397.3 does not create a rebuttable presumption of paternity until the probability of exclusion is 99.9%, and that based on the jurisprudence, the PI in the present case appears to be low; See State, DOSS v. Thomas, 27,248 (La.App.2d Cir. 8/23/95), 660 So.2d 163 (PI of 16,500 to 1  which indicates that defendant is 16,500 times more likely to be the parent than a randomly selected, unrelated male of the North American black population); State, DOSS in Interest of Johnson v. White, 26,673 (La.App.2d Cir. 3/1/95), 651 So.2d 366 (PI of 3,577 to 1); Litton v. Litton, 624 So.2d 472 (La.App. 2d Cir.1993) (PI of 1,359 to 1); State v. Givens, 616 So.2d 259 (La.App. 2d Cir.1993) (PI of 1,064 to 1); State v. Smith, 605 So.2d 222 (La.App. 2d Cir.1992) (PI of 3,474 to 1); State in Interest of Lawrence v. Harrell, 582 So.2d 940 (La.App. 2d Cir.1991) (PI of 6,318 to 1).
[2] In Montgomery, the blood test results showed a combined paternity index of 460 to 1 and a probability of paternity of 99.78%.
[3] The trial court noted that in her deposition the Mother could not remember when during the month of July she discovered she was pregnant.
[1] Further, I view the plaintiff's statement in this regard ("That's fine, Your Honor") not as a waiver but as a sign of his exasperation. Counsel clearly stated his basis for the objection, i.e., that he understood the rule to mean he could question Smith on any new subject area covered by his own counsel.