h STEWART, J.
The defendant, Byron Bradley, was charged with carnal knowledge of a juvenile, in violation of La. R.S. 14:80. Following a bench trial, the trial court found that the defendant was not guilty of the criminal charge. The Louisiana Department of Social Services (DOSS) filed a separate suit to establish paternity and submitted the matter based on the criminal record. In this case, the DOSS appeals from a judgment denying its action against Bradley to establish Bradley as the father of the minor child, M.N. For the following reasons, we affirm.
FACTS
Suspecting that the child might be pregnant, L.N. took her 13-year-old daughter, A.N., to the Red River Parish Health Unit in May 1996. Tests revealed that the child was pregnant, and L.N. notified police. A.N. told police that her mother’s live-in boyfriend, Byron Bradley, had forced her to have sex with him in January 1996. On June 6, 1996, the state criminally charged Bradley with carnal knowledge of a juvenile. The bill of information specified a single date for the offense, January 13, 1996. On June 13, 1996, A.N. applied for W.I.C. public assistance. W.I.C. records report that A.N.’s last menstrual period was on November 19, 1995. On July 19, 1996, A.N. gave birth to a baby girl, M.N., that weighed four pounds, nine ounces but was otherwise healthy. Medical records from the hospital state that the gestational period was 34 weeks and 5 days. However, records from the health unit show that A.N. reported that her last menstruation period occurred in April 1996, and A.N. so testified at trial.
*788 In the summer of 1997, representatives of Laboratory Corporation of America (LabCorp) conducted a DNA analysis of specimens from Bradley, A.N., and M.N. LabCorp’s report on the DNA test reflects:
| ¡^Conclusion:
The alleged father, Byron L. Bradley, cannot be excluded as the biological father of the child, [M.N.], since they share genetic markers. Using the above systems, the probability of paternity is 99.91%, as compared to an untested, unrelated man of the Black population.
Combined Paternity Index: 1,096 to 1
On June 8, 1998, the criminal case proceeded to trial. A.N. testified that she had no boyfriends and that she never had sex with anyone besides Byron Bradley. She said that the date of their first sexual encounter was January 13 or 14, 1996. She said that she remembered the date because her mother had left their home to attend a funeral. She described the encounter as follows:
[H]e grabbed the switch [and] made like he was going to whip me. He told me to take off my clothes. I took off my clothes. He like pushed me on the bed. And he got on top of me and he started having sex with me. He called my sister in there. When he called her in there he was still on top of me. Then he got off of me and he shook himself at my sister.
By “shook himself’ A.N. explained that she meant Bradley shook his penis at her sister. She said that she did not tell anyone about the encounter at the time. A.N. testified that she did not know that she was pregnant until she saw the test results from the health unit. She further testified that Bradley had given her $60 to help pay for the baby’s first birthday party, that he had given her $20 on occasion for diapers, and that Bradley had bought the child a pair of tennis shoes.
A.N.’s 14 year-old-sister testified that Bradley called her to the bedroom where she saw Bradley “on top of’ A.N., “doing it with her.” However, she said she never saw Bradley’s penis.
A.N.’s mother, L.N., testified that Bradley had bought or helped to buy several items for the baby. She said that A.N. had maintained that she had never had sex with anyone besides Bradley. She also said that before these events, she and Bradley traveled out of town on occasion due to Bradley’s employment as a | ¡¡truck driver, but that her children were never left alone because a relative always stayed with the children.
Bradley’s mother, Azarene, testified that Bradley had two children by a woman other than L.N., that Bradley supported those children, and that the children used Bradley’s name as their own. Bradley’s aunt, Minnie, testified that she was familiar with A.N.’s family from living nearby and knew that L.N. had whipped A.N. for “having boyfriends.” Minnie Bradley’s granddaughter and a school friend of A.N., A.A., testified that she and A.N. were “best friends,” and that A.N. had told her that she had engaged in sexual intercourse with four young men. According to A.A., A.N. said that one D.D., not Bradley, was the father of her child. A.A. said that at least some of this sexual activity occurred before A.N. became pregnant. A.N. testified that she never made these statements to A.A.
Byron Bradley testified that while he lived with L.N. he acted as a father to her children and that he had trouble disciplining A.N. Bradley said that A.N. had a “quick temper.” Bradley said that his efforts to have A.N. do her chores around the house before participating in recreational activities most often led to conflict.
Bradley said that A.N. often stayed with another local family, the D’s, and that he did not know who A.N. saw while she was there. L.N. said that A.N. stayed with the D’s “one day out of the week, maybe, or a couple of days.” Bradley said that he was *789 a “distant cousin” to the D family. Notably, two members of the D family, D.D., and E.D., a 23-year-old male, were persons that A.A. reported that A.N. had engaged in sexual intercourse with. All of the young men identified by A.A. as A.N.’s sexual partners, including D.D. and E.D., testified that they had never had sexual intercourse with A.N. One of the young-men, D.B., lived three houses down from A.N. and testified that he and AN. had dated in “1995, I think” but that they had never had sex. Bradley flatly denied that |4he had ever had intercourse with A.N., and further denied that he had acknowledged the child as his own or given A.N. any money for the child.
Scientific, medical and statistical questions comprised the remainder of the evidence. Dr. Clifton Harris, associate director of LabCorp, testified as an expert in genetic marker testing and its application to parentage evaluation. Dr. Harris testified that LabCorp performed six genetic tests of a type he described as short tandem repeat DNA polymorphisms.[1] Dr. Harris explained that the procedure for this testing is first to determine, if possible, the maternal contribution to the child’s genetic markers. He said that one of the child’s markers must come from the child’s father, and that if the alleged father has all of the genetic markers that the child must receive from its biological father, the alleged father fails to be excluded from paternity. If the alleged father lacks two or more of those genetic markers, then he is excluded from paternity. Dr. Harris explained that if an alleged father is not excluded, the laboratory can calculate a paternity index estimate of the likelihood of paternity:
Each test system has a paternity index. And the way we calculate the paternity index is we look at the typing of the alleged father, and determine how likely he is to pass to any of his children the genetic marker that this child must have received. And normally ... it is either 1.0 or 0.5. Because if a man has two copies of the same genetic markers, then all his sperm have to contain that genetic marker, and the other half would have the other genetic marker. And then we simply divide that number by the frequency we have observed the requisite paternal genetic marker in the relevant population. That ratio is the paternity index for a given system. After we have the paternity indexes for all of the systems, we simply multiply them together. That’s known as the cross-product. That gives the combined paternity index. We then convert the combined paternity index into the more familiar probability of paternity, which appears in a percentage form.
The doctor stated that this process is accepted by the scientific community. Dr. Harris then produced a chart showing how the calculations were made in this case | fito lead to the probability of paternity given in the report. Dr. Harris noted that the 99.91 probability of paternity was calculated comparing Mr. Bradley to an untested, unrelated man of the black population. Dr. Harris also stated that “99.83 percent of black males chosen at random would be excluded from paternity, if tested in this same manner and matched against this mother and child.”
Dr. Susan White, a Ph.D. statistician from Northwestern State University, testified on behalf of the defendant and challenged several aspects of the calculation of the probability of paternity. Dr. White had four areas of contention with the probability of paternity. Foremost among these concerns was the presumption built into the probability that the individual genetic tests were statistically independent. Dr. White explained that independence is a statistical concept whereby probability is not changed with prior information. In the context of genetic testing, Dr. White said that the calculations assume that each genetic marker is independent of any other, but this assumption is not necessarily *790 warranted. She explained that if the genetic markers observed in the test are not independent, the probability of paternity would be lower. Dr. White said that the scientific community is “very torn over this very issue. There are experts that say the assumption of independence is a terrible, terrible assumption to make because genetic traits do tend to be combined.”
Dr. White explained that the potential error induced by this assumption of independence is magnified by her second concern, the difference between the demographics of Red River Parish and the nation as a whole. The doctor stated that the database for genetic testing generally mirrors the demographics of the United States as a whole, but that the nationwide data is markedly different from the data for Red River Parish. Specifically, U.S. census data shows that a substantially higher percentage of Red River Parish residents are black as | ^compared with the percentage nationally. Further, Dr. White stated that from her experience she knew that people in Red River Parish tended to stay in that area whereas other areas of the United States tended to have a more mobile population. She explained that these characteristics of the Parish were relevant because relatives of Bradley would share some of Bradley’s DNA characteristics and if, as alleged, one or more of Bradley’s relatives had intercourse with A.N., genetic tests on the relatives may return results similar to Bradley’s.
Defense counsel questioned Dr. Harris about LabCorp’s testing with reference to these concerns:
Q: Going back to the statistical analysis, you do not ... your comparison is made based upon the population as a whole, based on the United States population, it does not consider a specific region, it is not narrowed down to a specific regional geographic area, does it?
A: For the most part, no.
Q: If you had a population, or if you considered your population in a confined or small geographic region, where there existed an increased chance of inbred populations, then wouldn’t the probability calculations, based on the estimates from outbred populations be varied, be different or be invalid?
A: I don’t know. I haven’t done the experiment, so I don’t know. We have found the population substrueturing is pretty much irrelevant. We have looked at geographic subgroups, or geographic groups of people of the same race throughout the U.S. and we don’t find any distinguishable difference in the frequencies of the genetic markers. So we haven’t concerned ourselves with that.
Q: If you took the population, for example, of Red River Parish, of black males from ages 15 to 25, and you placed that in your equation in lieu of the general U.S. population, wouldn’t it alter the outcome of your paternity index with respect to Byron Bradley, in fact, wouldn’t it increase the chances of him not being excluded as the father?
A: In answer to your first question, I don’t know. I haven’t done the experiment. But probably not.
Q: But the bottom line is you don’t know?
|7A: I haven’t done the experiment.
Dr. White’s third concern with the probability of paternity is that the markers matching the mother were also used in the calculation. Because the child’s mother is known, and in one test the same marker appeared for both the mother and Bradley, Dr. White questioned the use of that marker in the calculation. Dr. White’s fourth concern was that the calculation began with the assumption that Bradley was the father, although the witness said that “sometimes with statistics you have no choice. That’s the way you have to do it.” Based on U.S. census data, Dr. White calculated that if the genetic markers are not independent, 145 black males in Red *791 River Parish could be “matched” as the father of the child.
Dr. Fred Willis, a family physician, testified that it was “highly unlikely” that the child born to A.N. was conceived in January 1996. The doctor reviewed the medical records and said that the baby’s birth weight, although low, was consistent with a date of conception in December 1995.
Dr. Jackie Huckabay, a Coushatta physician, gave a similar opinion. Dr. Hucka-bay said that the baby could not have been conceived as a result of intercourse on January 13, 1996 and that the child was probably conceived in mid-November 1995. Dr. Huckabay based this conclusion on the child’s weight, the mother’s age and race, and the child’s brief stay in ICU reflecting no prematurity in organ development.
Dr. Brad Sams, an obstetrician, testified that there was “absolutely no way that [intercourse on January 13, 1996] could have resulted from that child.” Dr. Sams indicated that hospital records showed several times that A.N.’s last menstrual period was in November 1995 and that the child’s development and birth weight are more consistent with conception in November or December 1995.
Is At the close of the criminal case, the trial court stated that it found the lay witnesses more credible than the prosecution -witnesses, “and I think that they, themselves, created a reasonable doubt.” Noting that but for the DNA evidence, the medical opinions were all in favor of the defendant and that the statistician “threw some doubt” on some of the calculations, the trial court acquitted the defendant. The state now appeals.
DISCUSSION
By assignment of error, the state argues that the trial court erred in finding that the state had failed to prove that Byron Bradley was the child’s father. The DOSS petition was filed under the authority of La. R.S. 46:236.1, which provides, in part:
F. (1) The department, except when it is not in the best interest of the child, may without the necessity of written assignment, subrogation, tutorship proceedings, or divorce proceedings, take direct civil action, including actions to establish filiation against an alleged biological parent notwithstanding the existence of a legal presumption that another person is the parent of the child solely for the purpose of fulfilling its responsibility under this Section, in any court of competent jurisdiction, to obtain an order, judgment, or agreement of support against the responsible person in any case in which the department is providing services under this Section.
La. C.C. art. 209 specifies the standard of proof and provides, in part:
A. A child not entitled to legitimate filiation nor filiated by the initiative of the parent by legitimation or by acknowledgment under Article 203 must prove filiation as to an alleged living-parent by a preponderance of the evidence in a civil proceeding instituted by the child or on his behalf within the time limit provided in this article.
The evidentiary effect of the DNA testing is set forth in La. R.S. 9:397.3, which provides, in part:
(B)(2)(b) A certified report of blood or tissue sampling which indicates by a ninety-nine and nine-tenths percentage point threshold probability that the alleged father is the father of the child creates a rebuttable presumption of paternity.
|fl(D) If the court finds that the conclusions of all the experts as disclosed by the reports, based upon the tests, are .that the alleged father is not the father of the child, the question of paternity shall be resolved accordingly. If the experts disagree in their findings or conclusions, the question shall be submitted upon all the evidence.
*792 While scientific testing, alone, is insufficient to prove paternity, such testing provides persuasive and objective evidence that can help establish proof by a preponderance. LeBlanc v. LeBlanc, 497 So.2d 1361 (La.1986); State in the Interest of Vinson v. Smith, 29,464 (La.App.2d Cir.6/18/97), 697 So.2d 628, 630.
In the ordinary case, a court of appeal may not set aside a trial court’s factual finding in the absence of manifest error or unless it is clearly wrong, and where there is conflict in the testimony, reasonable inferences of fact should not be disturbed on review, even though the appellate court may feel its own evaluations and inferences are equally reasonable. Stobart v. State, Through DOTD, 617 So.2d 880 (La.1993); Rosell v. ESCO, 549 So.2d 840 (La.1989). To the extent that the opinions of the judge in the criminal case can be determined, we afford deference to the judge in that case. However, in this case the parties submitted the civil matter to the trial court for decision on the criminal record. In such cases, our review of the record is made independently and without the recognition and weight usually afforded to the trier of fact when credibility issues are presented. Fabiano v. Bryan, 438 So.2d 719, 720 (La.App. 2d Cir.1983); Allstate Insurance Company v. Shemwell, 142 So.2d 866 (La.App. 2d Cir. 1962).
The scientific testing, and the 99.91 probability of paternity, was challenged in this case on grounds most clearly articulated by Judge Plotkin’s concurrence in State v. Quatrevingt, 617 So.2d 484, 500 (La. App. 4th Cir.1992), affirmed, 93-1644 (La.2/28/96), 670 So.2d 197, in the section captioned “Population Statistics.” The potential error presented by an unwarranted assumption of database homogeneity across regions and subgroups is compounded by the [^allegations in this case that two of the defendant’s relatives may have had sexual intercourse with A.N. near the time of conception. Dr. Harris admitted that he did not know whether the unusual demographic of Red River Parish would affect the probability of paternity and also indicated that the 99.91% probability of paternity was for untested and unrelated black males from the general population. Unlike State v. Edwards, 97-1797 (La.7/2/99), 750 So.2d 893, 910-911, cert. denied, Edwards v. Louisiana, 528 U.S. 1026, 120 S.Ct. 542, 145 L.Ed.2d 421 (1999), no clear description of the database was introduced in this case.
Although the precise impact of the errors in the statistical analysis is unclear, we are convinced that the questions raised by the defense cast sufficient doubt upon the 99.91% probability of paternity that the calculation cannot in this case raise a presumption under La. R.S. 9:397.3(B)(2)(b) that Bradley is the father.
We, like the trial judge, are confined to the evidence submitted at the criminal trial of this case. Because the state charged Bradley with an act allegedly occurring on a particular date, the evidence at trial focused primarily upon whether conception of the child could have occurred on that date. The state rightly argues that the ultimate question in this case is not whether Bradley and A.N. had intercourse on January 13,1996, but instead is whether or not Bradley is the child’s father. However, apart from the DNA evidence of uncertain value, the evidence that Bradley is the father primarily comes from the testimony of A.N. and her sister. The judge in the criminal case, who actually heard the witnesses testify in deciding a motion for acquittal under La.C.Cr.P. art. 778, stated:
The Court noted serious discrepancies between the testimony of the alleged victim and the testimony of her sister who was an alleged eyewitness to part of the alleged act forming the basis of the charges.
|T1In other passages, the court expressed its concern with the credibility of these witnesses. With no other testimony about sexual intercourse between Bradley and A.N. except that testimony that firmly fixes the date as January 13, 1996, this court *793 must consider the effect of that testimony on the state’s case. A.N. testified that she had never had sexual intercourse prior to January 13,1996. As the trial court in the criminal and civil cases found, the testimony of several physicians flatly contradicts A.N.’s version of events; the doctors unanimously agreed that the child could not have been conceived on that date but instead was conceived at the end of November or the beginning of December 1995. This is consistent with the W.I.C. record reporting A.N.’s last menstrual period as November 1995.
Even though the standard of proof in this civil case is proof by a preponderance of the evidence, rather than the more stringent burden of proof beyond a reasonable doubt in the criminal case, we hold that the state failed to prove that Bradley is the father of the child. Although the DNA evidence is highly persuasive, we agree that the statistical analysis used to calculate the probability of paternity was in this case sufficiently flawed as to cast serious doubt on the seemingly high probability given in LabCorp’s report. Particularly in a case where the defendant alleges that one or more of his family members may have had intercourse with the mother, the evidence should explain how the results uniquely identify the defendant as the father. No such explanation was offered in this case. Further, A.N. was certain regarding the date of the alleged intercourse, but the medical evidence strongly refutes that testimony. Considering the record as a whole, the state simply failed to prove by a preponderance of the evidence that Bradley is the child’s father. This assignment of error lacks merit.
I ^CONCLUSION
For the above reasons, we affirm the decision of the trial court.
AFFIRMED.

. The tests were: D-l-S-80; C-S-F-R, F-ES, V-W-F, F-G-A and C-Y-P-19.